# EDMUND J. FOLSOM, Surviving Partner of WM. B. FOLSOM, Trading as B. F. FOLSOM & CO. *vs.* THE DETRICK FERTILIZER AND CHEMICAL CO. et al.

*Corporations—Transfer of a Trader's Insolvent Business to a Corporation Controlled by Him—Preference to Individual Creditor of Trader—Rights of Subsequent Creditors of the Corporation—Fraudulent Conveyances—Partnership Real Estate—Parties.*

W., a trader then insolvent, in order to secure the payment of his principal creditor F., transferred all of his property to a corporation organized by himself and the creditor, and controlled by the latter. All of the stock of the corporation was issued as full paid to W., and the corporation also issued to him promissory notes to a large amount and assumed his debts. The valuation put upon the property transferred to the corporation for the stock and notes was largely in excess of its real value. Most of the promissory notes of the corporation were assigned by W. to his creditor F., and the corporation afterwards executed to F. a deed of certain property in satisfaction of some of them. Upon a bill by subsequent creditors of the corporation which was insolvent, *Held,*

1st. That the effect and object of this transaction was to delay, hinder and defraud subsequent creditors of the corporation, the plan being to use the property of the corporation to pay W.'s debt to F. and to leave the future debts of the corporation unpaid.

2nd. That the conveyance of the property to F. should be vacated.

3rd. That the promissory notes executed by the corporation to W. must be postponed to the claims of subsequent creditors without notice. (*a*).

Where a conveyance of real estate to a firm in payment of a debt due to it is assailed because in fraud of the rights of creditors of the grantor, the heirs of a deceased partner are not necessary parties to a bill by the creditors.

(*a*). In this case the business transferred to the corporation was insolvent at the time, and the object of the parties was to secure the payment of one creditor of the insolvent who controlled the corporation. After the argument of this case the House of Lords held in *Salomon v. A. Salomon & Co.*, [1897] App. Cas. 22, that it is not contrary to

Appeal from a decree of the Circuit Court of Baltimore City (DENNIS, J.), by which it was adjudged that the deed of certain real estate from the Wooldridge Co. to Folsom & Co., mentioned in the opinion of the Court, be set aside and declared to be null and void.   " And that the said property shall be sold by the receivers, and the proceeds thereof appropriated to the payment of the claims of the complainants in this cause, and such other creditors as shall file *bona fide* claims and stand on a similar footing with the plaintiffs against the said Wooldridge Fertilizer Company.   And that within ten days from the date hereof, the said firm of B. F. Folsom and Company and T. Jelke report to this Court the exact amount of money paid to each of them respectively, and the dates of such payments on account of the principal and interest of said seventy-eight thousand dollars ($78,000.00) of promissory notes, between the first of January, 1893, and the 17th day of January, 1896 ; and that the same be paid into this Court to the credit of this case within thirty days from the date of this decree, to reimburse said corporation for the amount of money paid to said Folsom and Company and T. Jelke on the principal and interest of said seventy-eight thousand dollars ($78,000.00) of coupon notes, issued by said Wooldridge Fertilizer Company to the said Robert A. Wooldridge, and sixty-eight thousand dollars ($68,000.00) of which was delivered by the said Robert A. Wooldridge to Folsom and Company, and ten

---

the true intent of the Companies Act of 1862 for a trader, in order to limit his liability and obtain the preference of a debenture holder over other creditors, to sell his business to a limited liability company consisting only of himself and six members of his family, *the business being then solvent,* all the terms of the sale being known to and approved by the shareholders and all the requirements of the Act being complied with: Reversing the Court of Appeal in *Broderip* v. *Salomon* [1895], 2 Ch. 323.   The decision of the House of Lords is criticised by Sir Frederick Pollock in 13 Law Quarterly Review, 6, 7. Questions relating to "One man corporations," are considered in *Pott & Co.* v. *Schmucker,* 84 Md. 535; *Swift* v. *Smith,* 65 Md. 428; *Louisville Banking Co.* v. *Eisenman Bros. & Co.,* 94 Ky. 83; *S. C.* with note, 19 L. R. A. 684; *Cook on Stock and Stockholders,* secs. 617, 663.

thousand dollars ($10,000.00) to T. Jelke. And that in the distribution of the assets arising from the sales and collections to be made by the receivers, the claims of Folsom and Company and T. Jelke on the said seventy-eight thousand dollars ($78,000.00) of coupon notes referred to in the proceedings be postponed to those of the plaintiffs and such other creditors who may come in and stand on a similar footing with the plaintiffs in this cause."

The cause was argued before McSHERRY, C. J., BRYAN, BRISCOE, PAGE, BOYD and RUSSUM, JJ.

*Arthur Geo. Brown* and *W. George Weld,* for the appellant.

The firm of B. F. Folsom & Co., of Boston, was, in August, 1891, dealing with Robert A. Wooldridge of Baltimore, selling him materials for the manufacture of fertilizer. For the purpose of transferring his business to a corporation, Wooldridge procured from the State of West Virginia, in August, 1891, a charter for the "Wooldridge Fertilizer Company." The company was organized in October, 1891. Robert A. Wooldridge continued to do business individually until January 9th, 1893. At that time he owed to B. F. Folsom & Co., $98,000; to his father-in-law, F. Jelke, $10,000; and to all other creditors, $24,609.04. Total, $132,609.04. At this time he transferred his entire assets and business to the corporation which had been formed in 1891. His assets footed up $141,780.58, and in addition thereto he valued at $60,828.46 the good will and trademarks, etc., the "etc." consisting of the machinery in the Smith's wharf warehouse and the fertilizer factory complete, 25 horse-power gas engine, mixer, shafting, pulleys and belting. The sum of the two above amounts is $202,609.04, and the corporation purchased the assets, good will, formulas, trademarks and all other property and assets owned by Wooldridge in connection with the business, for that sum, payable $100,000 in stock of the company, $78,000 in notes of the company, and $24,609.04 by the assumption of his liabilities to that amount, being his whole indebtedness, ex-

cept what he owed to B. F. Folsom & Co., and his father-in-law, Jelke.

B. F. Folsom & Co. made a personal arrangement with Woolridge by which they cancelled in his favor $30,000 of his debt to them, and accepted for the residue by endorsement from him $68,000 of the notes issued by the company to him, upon condition that F. Jelke would similarly accept $10,000 of said notes and cancel his claim. The notes were made to cover at intervals a period of ten years. As collateral security for the payment by Wooldridge of the $68,000 of the notes endorsed by him, he transferred to three trustees, none of whom are parties to this case, $60,000 of the stock of the company, part of the $100,000 issued to him. Wooldridge still holds $30,000 of the $100,000 of stock issued to him, and $10,000 of it is held by other parties. Wooldridge was made president of the company; it paid the indebtedness of $24,609.04 assumed by it and carried on business continuously, paying all current obligations down to January, 1896. B. F. Folsom & Co. dealt with it continuously, and the Orchilla Guano Co., in which they have the controlling interest, is at present a creditor to a considerable amount. In December, 1893, the company sold to B. F. Folsom & Co., for $15,000, the Smith's wharf warehouse, part of the property transferred by Wooldridge to the company, and which had been so transferred at a valuation of $11,881.02, and the company applied the proceeds to the retirement of $15,000 of its outstanding notes, part of those endorsed by Wooldridge to B. F. Folsom & Co. All of the above corporate proceedings were fully entered on the records of the corporation. The deed conveying the Smith's wharf property was at once recorded, and a confirmatory deed was also recorded a month later, to correct a misrecital in first deed. From the above facts the appellees, creditors of the Wooldridge Fertilizer Company, the earliest of whose claims is dated 29th May, 1895, and fell due only on 13th January, 1896, and the others of whose claims bear dates in September and October, 1895, and fall due in Jan-

uary and February, 1896 (of which only $2,706.86 in notes, and a trifling amount on open account, had matured when the bill was filed), have charged against the appellant, the company, and Wooldridge, a scheme to defraud them, and this charge is the basis of their suit. Alleged insolvency of the corporation is set up as ground for the appointment of receivers. The corporation is named a party defendant, but no process has issued against it nor has any appearance been entered for it or answer filed by it.

The jurisdiction of the Court cannot be maintained for the purpose of impounding and selling the personal assets of this foreign private corporation. Apart from statutory power, a Court of Equity cannot dissolve even a resident corporation, and it " usually declines to assume control over the management of the affairs of a corporation upon a bill * * alleging fraud, mismanagement and collusion on the part of the corporate authorities, since such interference would necessarily result in the dissolution of the corporation, and the Court would thus accomplish, indirectly, what it has no power to do directly." *Mason* v. *Supreme Court of the Equitable League*, 77 Md. 484. " The power of a receiver when put in motion, of necessity, supersedes the corporate power. It necessarily displaces the corporate management and substitutes its own * * * irrespective of the effect of the Code ; there is no jurisdiction vested in Courts of Equity to appoint a receiver of the property of a corporation in a suit prosecuted by a private party." *The French Bank case*, 53 Cal. 550. Upon the authority of the Maryland cases of *North State Co.* v. *Field*, 64 Md. 151, and *Wilkins* v. *Thorne*, 60 Md. 253, the Circuit Court of Appeals, reversing the Circuit Court of the United States for Colorado, has recently held that the decree of the Circuit Court was erroneous in so far as it contained provisions which contemplated a sale of all the property of an English corporation in the State of Colorado and a general liquidation of its affairs. *Republican Silver Mines* v. *Brown*, 58 Fed. Rep. 645.

Nor can the jurisdiction of the Court be maintained in respect of the situs of the Smith's wharf property, for no process has been served upon the company, a necessary party to any suit to set aside its deed.  *Chadbourne* v. *Coe*, 10 U. S. App. 78, 83 ; *Lovejoy* v. *Irelan*, 17 Md. 525. Merely naming a person in a bill as a defendant does not make him a party, without actual service of process.  The appellees base their claims upon an assumption of fraudulent purpose from :  1. The existence among the total assets of $141,780.58, put in by Wooldridge to the company, of an item, there noted as " R. A. Wooldridge Stock Account, $24,857.28," but now amplified by him so as to show that it consisted of certain stocks and securities which appellees contend were not suitable for the business of the corporation and the putting in by him of the good-will, trademarks, etc., at a valuation of $60,828.46.  2. The appellees' allegation that Wooldridge and the company as originally organized, are insolvent, and that the notes issued to him and endorsed to B. F. Folsom & Co., were fraudulent as to them, and that the transfer of the Smith's wharf property and retirement of a part of the notes, and the assignment of $60,000 of the stock by Wooldridge to trustees, as collateral security for the notes, were all fraudulent as to them.

No deceit has been practised, and all the corporate proceedings were faithfully recorded, and were so accessible on enquiry that they are all produced in this case by the appellees themselves ; these transactions therefore must be judged by their inherent nature, which is in no respect fraudulent.  Upon the appellees' contention, the simple result of this case is that the capital stock has not been paid for in full.  If that be so, the creditors may enforce that liability, but this is not that suit in form, substance, or as to parties.  In such a suit, the appellant, whose rights in the stock are held as collateral, would not be liable.  *Beall* v. *Essex Savings Bank*, 33 U. S. App. 101.  The exercise of voting rights would not impose any liability.  *Burgess* v. *Seligman*, 107 U. S. 20, 28 *et seq.*

Leaving out of consideration, for the moment, the capital stock, surely the property acquired by the corporation was worth more than the bonds issued for it. B. F. Folsom & Co. gave Wooldridge time, took notes from him, and his assets were assigned to the corporation which issued the notes. In respect to that transaction there could be no imputation of fraud.

New creditors were not deceived. As to the capital stock, either it was fully paid, or it was not. If it was, no one was hurt. If it was not, and to the extent that it was not paid, creditors have and may assert, in an appropriate proceeding, all the rights which the law gives them. Appellees are welcome to either horn they may prefer of that dilemma. If the stock was not fully paid, they cannot complain, because no representations on that subject were made to them, and they never enquired. All they knew or cared to know, as the record shows, was that the Wooldridge Fertilizer Company was a corporation, which simply meant that an agreement in a certain form had been executed and recorded under the West Virginia law, and that a small amount had been paid on account of the stock subscribed, as required by law. There can be no question that the corporation was validly formed, the certificate is conclusive. *Laflin & Rand Powder Co.* v. *Sinsheimer*, 46 Md. 315, 320; *Upper Glymont Co.* v. *Toler*, 80 Md. 289. And the appellees dealt with it as such, which makes it conclusive as to them. *Lancaster* v. *Amsterdam Imp. Co.*, 140 N. Y. 576; 24 L. R. A., 322. Appellees' whole contention as to fraud relates solely to the payment or non-payment of the capital stock. For the purposes of this case it makes no difference what is the true view as to that question; it may be decided either way.

If this were, as it is not, a suit to compel payment of an unpaid or of an only partly paid stock subscription, the grounds of appellees' claims would still fail to support it.

Upon the accepted rule of law the corporation might fairly have issued mortgage bonds instead of the unsecured

notes in question, and that, too, at less than par, if desired.

"It is customary to issue the bonds of a corporation in payment for property or construction work. In fact this is the favorite mode of issuing bonds at less than their par value. The real value of the property or construction work being uncertain, it is difficult to detect the real price at which the bonds are issued; and when it is borne in mind that bonds may be issued below par, even when issued for cash, the safety of issuing bonds far below par, in payment for property or construction work, becomes apparent. The Courts have quite uniformly sustained such issues of bonds even though the value of the property or construction work is far less than the par value of the bonds." *2 Cook on Stock and Stockholders,* sec. 764. Wooldridge, the appellees' witness, at the time, thought the assets worth more, he put them in in good faith; "there was no want of good faith on my part. I was not dumping off worthless assets on a new concern," he says. B. F. Folsom and Company acted in good faith and regarded the values put on the assets as being matters for Wooldridge to decide. Appellees have not adduced any testimony to show that the assets were not then fairly valued. On the contrary, all their proof is the other way, and taking the valuation made and assented to by all parties concerned, of $141,780.58 exclusive of the value put upon the good-will, trademarks, &c., and deducting from it the item of $24,857.28 comprising all the outside securities owned by Wooldridge, there remains $116,923.30 of assets fully appropriate for the business, besides the good-will and trademarks, &c. The total debt, including the notes in question, being but $102,000, the consideration for the issue of the notes will bear favorable comparison with any of the decided cases sustaining issues of corporate bonds. Apart from the $24,857.28 of outside securities, the corporation got for its $178,000 of stock and notes, property (inclusive of Wooldridge's estimate of the good-will, trademarks, &c.) to the amount of $177,741.76 in assets entirely suit-

able for the corporation. See 2 *Cook on Stock and Stockholders*, sec. 765 and cases cited.

Wooldridge valued the good-will, trademarks, machinery and fixtures, put in at estimates for a going concern. They were in their nature valuable in that connection. *Wilmer, Trustee*, v. *Thomas*, 74 Md. 485. A difference in valuation is not to be condemned as a fraud unless the parties acted in bad faith. They were made a feature of the receivers' advertisement; and even at the sacrifice auction sale, $13,000 was realized for them and for the unmanufactured material. (The lower Court is in error in referring to this as representing "all the assets." The receivers have collected more than $21,000 in addition, and considerable collections are still unmatured.) "A discrepancy as large as that between $80,000 or $85,000 and $110,000, is not necessarily a fraud," says the Court in *Gamble* v. *Queens Co. Water Co.*, 123 N. Y. 91 (1890), in a case where the lower Court had figured the cost of works, put in for $110,000 of stock and bonds, at less than $61,000. "The records of the company showed the transaction— it was not kept a secret. It does not appear that there was any deception or fraud practised by the parties. "I find no evidence of any representations as to its value or cost or purchase price made by the parties selling," says the Court in disposing of the issue of fraud raised as a defence to notes of a corporation, part of $200,000 of notes and $3,600,000 of stock given for a roadbed worth $2,000, in *Stewart* v. *St. Louis R. R. Co.*, 41 Fed. R. 738. "The patent and machinery (put in, in payment for $100,000 of stock) had been used in their business, which was continued under the charter. They were immediately serviceable and therefore had to the company a present value." *Coit* v. *Gold Amalgan Co.* 119 U. S. 343, 345.

*Frank Gosnell* (with whom was *T. M. Lanahan* on the brief), for the appellees.

With the affairs of Mr. Wooldridge in an insolvent condition, in fact, when according to his own evidence, he

could not have paid fifty cents on the dollar, the Wooldridge Fertilizer Company agreed to take all the assets of Wooldridge and to pay him therefor, not only the entire issue of $100,000 of its capital stock, *as fully paid*, but in addition thereto, agreed to pay all of his, Wooldridge's, debts, amounting to $102,609.04; thus in fact giving to Wooldridge $202,609.04 for that which he, upon the stand, swore would not have realized as much as $70,000. According to the minutes of the proceedings of the defendant corporation, filed in the cause, it appears that the transaction was consummated as follows : All the assets of Wooldridge as above mentioned were transferred to the corporation, and in payment therefor it issued to Wooldridge its capital stock amounting to $100,000; it issued to Wooldridge its coupon promissory notes amounting to $78,000, and it assumed all the other outstanding obligations of Wooldridge, which amounted to $24,609.04. Immediately upon the receipt by Wooldridge of the $78,000 of coupon notes, he transferred $68,000 thereof to B. F. Folsom and Company in payment of his debt to them, and he transferred the other $10,000 to Jelke in payment of his debt. The net result being that the Wooldridge Fertilizer Company owned all the assets of the insolvent business of Robert A. Wooldridge, at a grossly excessive over-valuation, and had assumed all the debts of Wooldridge, amounting to $102,609.04, and had all its capital stock of $100,000 outstanding, issued as fully paid, without a dollar in its treasury, except about $2,000 in cash turned over by Wooldridge, and appearing in the schedule filed in the cause.

No sooner had B. F. Folsom and Company (appellant) brought about this transformation, and had received $68,000 of the notes of the Wooldridge Fertilizer Company for their debt against Wooldridge, than they compelled him, Wooldridge, to surrender to them *absolute control* of the corporation, which was accomplished by the execution of the agreement bearing date the same 9th day of January,

1893.   By that agreement Wooldridge transferred 600 of his 1,000 shares of stock to the above-named Edwin G. McInness, M. H. Hoffmann (the bookkeeper and general manager of B. F. Folsom and Company), and Edmund F. Folsom, son of the said Edmund J. Folsom, in trust to secure the *prompt* payment of those notes.

It will thus be seen that the corporation was organized and controlled in the interest of the Folsoms for the *sole purpose* of securing the debt due them by Wooldridge (saddled upon the corporation as above detailed) at the expense of *bona fide* creditors of the corporation.   Or as expressed by Wooldridge, "*I was anxious to unload my debt and I thought this was a way out of my difficulties.*"   The corporation thus organized, immediately commenced contracting debts, chiefly with the appellees, the claims due them now amounting to over $22,000, exclusive of interest.   In fact the Wooldridge Fertilizer Company (except to the extent of about $2,000) does not owe any one but the appellees, leaving out of consideration Jelke, B. F. Folsom and Company and the Orchilla Guano Company, a corporation controlled by appellant.

We find from the evidence, moreover, that during the three years of the existence of the corporation, it paid in cash on account of the principal of the $78,000 coupon notes, as follows :   $10,500 to Folsom and Company and $1,000 to Jelke, in addition to three years' interest on the principal due.   And this, notwithstanding the fact that the corporation was not making, but on the contrary was losing money, from the start, as is shown by the statement of its business for the year 1893.   Attempt was made to cancel $15,000 more of the notes held by Folsom and Company, as follows :   On the 28th day of December, 1893, Folsom and Company, McInnes and Hoffman had a resolution passed whereby the Wooldridge Fertilizer Company was to convey to B. F. Folsom and Company its warehouses, Nos. 217 and 219 Smith's wharf, in Baltimore City (the property now in controversy), for the alleged consideration of $15,000.

The deed and confirmatory deed of the property in question recite the consideration to be $15,000 *cash*, but instead of the money being paid into the business of the concern (which was then sorely in need of ready cash) it was agreed to cancel the coupon notes held by Folsom and Company to the extent of $15,000; and it is to be observed that the *notes maturing as late as 1898, 1899, 1900, 1901, 1902 and 1903 were those retired*, leaving those due in 1894, 1895, 1896 and 1897 outstanding.   This is evidence of the worst of bad faith and fraud upon the part of those concerned in the transaction.   The attempt was deliberately made to absorb the assets of the corporation to the prejudice of the rights of *bona fide* creditors.

It is not difficult to perceive that Folsom and Company were exercising the power given to them under the contract, whereby they were to control the corporation, in the interest of the coupon notes held by them, and the only wonder is that the corporation did not sooner succumb. The Wooldridge Fertilizer Company, having defaulted in payment of its obligations, appellees were put upon inquiry, and for the first time (within a few days before filing their bill of complaint) they discovered the frauds perpetrated as above detailed.   They found that they were the victims; that it was by purchases from them and other innocent creditors that the Folsoms were to be paid the old debt due by Wooldridge to them, and which he, Wooldridge, had "*unloaded*" upon the corporation.   The assets in the hands of the receivers not being sufficient to pay the *bona fide* claims against the Wooldridge Fertilizer Company, in full, appellees contended that the warehouses on Smith's wharf, and the money unlawfully paid to appellant were liable for their payment, basing their contention on the fact that no consideration whatever, as against them, had passed from Folsom and Company to the Wooldridge Fertilizer Company, for the property or for the payments in question, and that the coupon notes issued by the corporation were without consideration, *ultra vires*, and void.

The assets transferred by Wooldridge to the corporation, not being *actually* worth the capital stock of $100,000, no consideration whatever passed from Wooldridge for the coupon notes, amounting to $78,000, delivered to him by the Wooldridge Fertilizer Company, nor was there any consideration for the agreement to pay $24,609.04 of his other debts, assumed and paid by the corporation. In other words, when the corporation issued to Wooldridge its whole capital stock, *as fully paid*, they gave to Wooldridge every dollar, and more, than his assets were worth, according to his own uncontradicted testimony; hence the debts of Wooldridge "*unloaded*" upon the corporation, and assumed by it, had no consideration for their support, and being without consideration, were *ultra vires*, null and void, and no claim can be made against the corporation for the payment of the same by any original parties thereto, or persons taking the same with notice. This being so, the deed to the Smith's wharf property must fall, and the money paid to the appellant and his firm by the corporation on account of those notes should be refunded by the appellant to the receivers. *Atlas National Bank* v. *Moore*, 152 Ill. 528; *Hooper* v. *Central Trust Co.*, 81 Md. 580-1; *Crawford & Bixler* v. *Rohr*, 59 Md. 604-5; *Mish* v. *Main*, 81 Md. 44-46; *DuPuy* v. *Terminal Co.*, 82 Md. 408; *Ex parte Carey* [1895], 2 Q. B. 624-626. The Supreme Court of Illinois, in *Atlas National Bank* v. *Moore*, 152 Ill. 528, had the identical question before it in 1894, the facts of which case are strikingly analogous to the one at bar.

*Cowen, Cross & Bond* filed a brief as counsel for F. Jelke and *amici curiæ*.

BRYAN, J., delivered the opinion of the Court.

The appellees were severally creditors of the Wooldridge Fertilizer Company, a body politic and corporate. They filed a bill in equity containing allegations which impeached the validity of certain transactions between said corporation,

Robert A. Wooldridge and the partnership of B. F. Folsom & Co.  In due course the Court issued an injunction prohibiting the selling or disposition of the property of the corporation, appointed receivers, and passed a decree annulling and setting aside a deed made by the corporation, and declaring certain notes of the corporation invalid as against the complainants.

The facts as they appear to us are as follows :   In the year eighteen hundred and ninety-one the Wooldridge Fertilizer Company was incorporated in the State of West Virginia.   The incorporators were Edmund J. Folsom, Robert A. Woolridge, Edwin G. McInnes, William H. Edmunds and James Thurston;  Folsom and McInnes being residents of Boston, and the others residents of Baltimore.   The article of incorporation stated that the company should keep its principal office or place of business in the city of Baltimore, and that the corporators had subscribed the sum of five hundred dollars to the capital stock, and had paid in on said subscription fifty dollars, and that they desired to increase the capital to one hundred thousand dollars.  As stated in the instrument of incorporation the corporate body was formed " for the purpose of importing, buying, manufacturing and selling fertilizers, dealing in mining and working all kinds of fertilizing materials, and doing any and everything pertaining to the fertilizer business."  It appears to have done no business until January the ninth, eighteen hundred and ninety-three, when, according to the minutes of a meeting held on that day, it purchased from Robert A. Wooldridge, for the sum of two hundred and two thousand six hundred and nine dollars and four cents, all of his assets (with an exception of no consequence), together with the good will of his business, formulas, trademarks, &c., &c.   This price was payable as follows: One hundred thousand dollars in stock of the company (which was the entire amount of its stock), seventy-eight thousand dollars in notes of the company bearing interest at six per cent. per annum, payable semi-annually, and the remainder by

assuming the debts of R. A. Wooldridge and Company to the amount of twenty-four thousand six hundred and nine dollars and four cents. The Fertilizer Company was at this time without any property whatsoever. The property transferred to it in addition to the good will, formulas, trademarks, and about two thousand dollars in money consisted of bills receivable, open accounts, certain warehouses and their fixtures, merchandise, &c., &c., and a number of stocks aggregately of small value. The sum mentioned was largely in excess of the value of the property. The valuation put on the good will and trademarks was sixty thousand eight hundred and twenty-eight dollars and forty-six cents. The other property, exclusive of certain property on Smith's wharf, was estimated by Wooldridge in his testimony as worth about ninety-two thousand dollars. At the time of this transaction Wooldridge was heavily burdened with debt. In his testimony he stated that he owed one hundred and thirty-two thousand dollars; of this sum about ninety-eight thousand dollars were due to B. F. Folsom & Co. He stated that he could not have paid fifty cents on the dollar. B. F. Folsom & Co. abated thirty thousand dollars from the debt due the firm; thus reducing it to sixty-eight thousand dollars, which included eight thousand dollars of acumulated interest. On the day that Wooldridge transferred the property to the fertilizer property, he delivered to Folsom & Co. sixty-eight thousand dollars of the notes. He also on the same day made an agreement in writing with B. F. Folsom & Co., and certain trustees representing their interest, whereby he transferred to the said trustees six hundred shares of the stock of the Fertilizer Company for the purpose of securing the payment of the notes, declaring in the instrument of agreement that all voting rights belonging to the stock should be vested in the trustees, and that they should comply with such instructions in regard to voting as might be given from time to time by Folsom & Co.; and that they should take such action as they should deem necessary or proper for the se-

curity of the notes and the good management of the company; and that so long as the company should pay the principal and interest of the notes, as the same became due, the presidency and general management of the business of the company should be in the hands of Wooldridge, or in case of his death in the nominee of his executor or administrator (unless in the opinion of the trustees, or a majority of them, the security of the notes would probably be materially impaired thereby); and that in case one or more of the trustees should die or wish to be relieved from their duties, or become incapacitated to act, Wooldridge, or his legal representatives, Folsom & Co., and the remaining trustee or trustees, or a majority of them, might fill the vacancy or vacancies. On the twenty-eighth of December, eighteen hundred and ninety-three, the directors voted that the company should sell and convey to B. F. Folsom & Co., for fifteen thousand dollars, the warehouse and property at 217 and 219 Smith's wharf (which it had acquired from Wooldridge), and that the purchase money should be applied to the notes becoming due from July 1st, eighteen hundred and ninety-eight, to January 1st, nineteen hundred and three, inclusive, and to the coupons due January 1st, nineteen hundred and four. These notes were held by Folsom & Co. On the same day, at a special meeting of the stockholders, this action of the directors was unanimously ratified and confirmed. The directors present at the meeting when the sale was ordered were Wooldridge, Rhodes and McInnes; the stockholders present at the special meeting of stockholders when the action of the directors was unanimously ratified were the same persons and no others. Three of the five original corporators were Wooldridge, Folsom, the appellant, and McInnes, his son-in-law. The directors of the company were Wooldridge, Rhodes, his counsel, McInnes (the appellant's son-in-law), E. F. Folsom (his son), and Hoffman (his bookkeeper). At some time not particularly stated, Wooldridge delivered to T. Jelke, his father-in-law, ten thousand dollars of the

notes which he had received from the Fertilizer Company.
The Fertilizer Company paid the debt of twenty-four thou-
sand dollars and upwards, and several of the notes men-
tioned in the agreement for the purchase of the assets from
Wooldridge; but was insolvent when the bill was filed in
this case.

It is very apparent that this corporation was chartered in
pursuance of a scheme to relieve Wooldridge of an indebted-
ness which he was unable to pay, and to procure the pay-
ment to Folsom and Company of a debt which they were
unable to collect from the person who owed it.   All the
proceedings from the inception of its existence were de-
signed to accomplish this result.   In August, eighteen hun-
dred and ninety-one, it came into existence as a legal body
with the capacities conferred on it by its charter.   But it
had no property whatever, and therefore no means of exer-
cising its franchises.   On the ninth day of January, eighteen
hundred and ninety-three, the directors heretofore men-
tioned were elected, and on the same day the contract was
made with Wooldridge for the purchase of his assets.   The
corporation had nothing with which to make payment ex-
cept its unissued stock.   The contract required it to pay
more than two hundred thousand dollars for property, a
considerable portion of which was of no use whatever in the
prosecution of its business, and which in the aggregate was
far less in value than the price stipulated to be paid for it.
There may be and there probably is some inaccuracy in the
estimate of values made in the testimony, and also in Wool-
dridge's statement that he was unable to pay more than fifty
per cent. of his indebtedness.   But making due allowance
for mistake in these particulars, it is still evident to us that
there was great excess in the valuation of the property, and
that Wooldridge was insolvent.  We metion the exaggerated
price and the insolvency because they illustrate the working
of the scheme, which the incorporators of this company
were endeavoring to carry out.   The excessive price furn-
ished the occasion and opportunity for the assumption of

more than a hundred thousand dollars of debts due to Folsom & Co. and others by Wooldridge. We speak of a purchase by the corporation, and its agreement to pay this large price. These transactions were technically and legally corporate acts ; but in reality and substance they were the acts of Wooldridge and Folsom & Co. bearing corporate form and having the corporate authority. They had entire control of the corporation, and managed it according to their own wishes. They necessarily knew that in the course of its business of buying, selling and manufacturing, it would contract debts ; and that when it obtained credit, it would be on the faith of its apparent resources, and with the belief and expectation on the part of creditors that its earnings would be applied to the payment of debts contracted in the course of its business. But by the purchase which they made for it in the corporate name and the debts which they caused it to assume they sought to devote these resources and earnings to the payment of debts due by one of themselves to the other, and to third persons. Now, any one may readily see that if this purpose had been made known to persons dealing with the corporation, it would never have obtained credit. The purpose contemplated great injustice to future creditors. It was nothing less than a defeat of their claims. It took from them a fund which, according to the regular course of business, they had a right to believe would be applied to the debts due them. And it took it to pay debts unjustly imposed on the corporation by persons who controlled its action and sacrificed the corporate interest for their own private benefit. In short, the plan of Wooldridge and Folsom & Co. was to use the property of the corporation to pay debts in which they themselves were interested, and to leave its future debts unpaid. The corporation is to be considered as a person *sui juris* having an independent existence, distinct from the individual stockholders. It becomes subject to legal responsibilities just as a natural person endued with judgment and volition. The stockholders are beneficially the owners of its property, and

they may control its action; but it is beyond their power to exempt it from any legal responsibility which it may incur. If a natural person should enter into a combination such as we have described, the law would adjudge that the parties had associated together with intent to delay, hinder and defraud subsequent creditors. And such must be the judgment here. In the language of a learned Court, the Fertilizer Company might use the contract with Wooldridge "to fence against (subsequent) creditors, and consequently it is fraudulent." It cannot be questioned that a deed or contract made for the purpose of defeating future creditors is void as to them. *Williams* v. *Banks*, 11 Maryland, 251; *Brinton* v. *Hook*, 3 Maryland Chancery Decisions, 480; *Moore* v. *Blondheim*, 19 Maryland, 172. It may probably be (and we are not disposed to question it) that the persons who conducted these operations supposed that they had a right to deal with the corporate property as they did; but if so they were badly advised. They inflicted a wrong on subsequent creditors and it must be redressed without any reference to any opinion which they had as to their rights. We agree with the Court below in setting aside the deed for the property on Smith's wharf, and in holding that the notes must be postponed to the claims of subsequent creditors without notice.

The Court had the same jurisdiction over the corporation which it would have had over a natural person under the circumstances. It did not deal in any way with its charter, or impair any of its rights thereunder, but pursued the ordinary course by issuing an injunction and appointing receivers, which is adopted when the rights of *bona fide* creditors are to be secured against fraudulent deeds or contracts. Wooldridge answers the bill of complaint in his official character as president of the Wooldridge Fertilizer Company. This could not be taken for anything else than the answer of the corporation. No exception was taken to it in the Court below; but it was treated as the answer of the corporation, and the proceedings were conducted to a final de-

cree without objection to it.   If the answer had been excepted to, any objection to it might have been removed by amendment.

One of the partners of the firm of B. F. Folsom & Co. was dead when the bill was filed in this case, and the affairs of the partnership were conducted by the surviving partner.   It has been urged that the heirs of the deceased partner ought to have been made parties to the suit, on the ground that they were interested in the real estate on Smith's wharf.   But it was acquired and held as partnership property and it must be treated as personalty in the view of a Court of Equity as between the partners and parties prosecuting claims against the partnership.   This was the opinion of JUDGE STORY in *Hoxie* v. *Carr*, 1 Sumner, 183, and it was adopted by this Court in *Goodburn* v. *Stevens*, 5 Gill, 26.   Edmund J. Folsom, the surviving partner, is administering the affairs of the partnership, and is the proper party against whom claims and demands adverse to it should be prosecuted.   But even if the other partner were still alive a judgment or decree against one partner would bind the partnership property. *Rhodes* v. *Amsink*, 38 Maryland, 355 ; *Johnston* v. *Mathews*, 32 Maryland, 363.   When the partnership is wound up and the assets are to be divided according to the rights of the partners and their representatives a different question will arise.   We perceive no error in the decree of the Court below except in that portion of it which is made against Jelke, who was not a party to the suit.   This is an error of which the appellant has no right to complain ; but as the counsel for the appellees stated in open Court that it was inadvertently made, and consented that it should be corrected, we shall make the correction by striking out of the decree all reference to Jelke and affirm it as modified.

> *Decree modified and affirmed with costs.*