BALTIMORE HIGH GRADE BRICK CO. *vs.* JAMES W.
AMOS ET AL.

*Mortgage to Secure Future Advances Not Made in Conformity With
Code, Art. 66, sec. 2—Pretended Indemnity Mortgage—Bonus Ad-
vances to a Builder—Mortgages by a Lessee and Contract of Guar-
anty Constituting Fictitious Transactions—Right of Party Supplying
Materials For Houses to Have Invalid Mortgages Thereon Vacated
—Notice to Assignee of Real Nature of Transaction—Conveyances
Tending to Delay Creditors.*

A mortgage professing on its face to be made to secure a present indebt-
edness and also to indemnify the mortgagee against loss under a guar-
anty of a third party's debt, but which is in reality designed to secure
future advances only, there being no present indebtedness and no real
contract of indemnity, is invalid under Code, Art. 66, sec. 2, which
provides that no mortgage to secure future advances shall be valid, un-
less the amounts of the same and the times when they are to be made
shall be specifically stated in said mortgage ; this not to apply to mort-
gages to indemnify the mortgagee against loss from being endorser or
security.

A subsequent creditor of the mortgagor may maintain a bill to vacate
such a mortgage to secure future advances not executed in conformity
with Code, Art. 66, sec. 2, when the same was made for the purpose of
hindering and delaying the creditors of the mortgagor who furnished
materials used in the improvement of the property mortgaged.

The advice of counsel that certain mortgages and leases were regular in
form does not relieve the client from the imputation of the knowledge
of facts affecting the validity of the mortgages, etc., of which he had
actual notice.

The plaintiff company supplied the bricks used in the erection of forty-
nine houses on leasehold lots of ground and not having been paid there-
for filed the bill in this case to vacate certain mortgages of the interest
of the owner of the leasehold which appeared to constitute first liens on
all of the property for more than its value.   Plaintiff company alleged
that these mortgages were fraudulent as against it because tending to
delay and hinder creditors of the mortgagor, and also that they were
invalid under the provisions of the Code relating to mortgages to secure
future advances.   The evidence in the cause established the following
facts : The owners of a tract of land, desiring to improve and market
the same, made an agreement with one A, according to which leases
for 99 years were to be made of the land divided into 49 lots.   A was
to build a house on each lot and the owners of the fee agreed to give

him a certain sum as a bonus to induce him to build on the lots subject to the large ground rents created by the lease, and also agreed to advance to A additional sums to be used in the purchase of material. This latter loan was to be secured by mortgages to the land owners on the leasehold interest. The law giving to material men a mechanics' lien for supplies was then in force and the object of the parties was to make a mortgage on the leasehold interest to secure these future advances which should have priority over any liens that might be filed. Code, Art. 66, sec. 2, provides that no mortgage to secure future loans or advances shall be valid unless the amount or amounts of the same and the times when they are to be made shall be specifically stated in said mortgage; this not to apply to mortgages to indemnify the mortgagee against loss from being endorser or security. A, the party with whom the landowners made the above-mentioned agreement, did not become the lessee of the lots himself, but he procured one D a carpenter in his employment working for daily wages to act in that capacity and the plan adopted to carry out the agreement was as follows : The owners of the land executed leases of the lots to the said D for 99 years in the usual form, reserving the rents agreed upon. Then there was (1) an agreement between D and the land owners by which the latter were to advance the stipulated bonus in instalments and D was to erect the houses, and A guaranteed performance by D; (2) an agreement by A to sell to D the necessary material ; (3) a guaranty from the land owners to A of payment by D for the materials ; (4) an order on the owners from D directing payment to A of all sums to be advanced to him on account of the houses; (5) mortgages of the leasehold interests from D to the land owners. These mortgages, which the bill in this case sought to have annulled, recited a present indebtedness from D to the mortgagees of a specified amount payable one year after date, and also professed to indemnify the mortgagees against loss under their guaranty to A of payment for the building materials to be sold by him to D. The evidence showed that D signed these papers without knowing anything about them and in pursuance of A's orders and that D had no interest in any of the property. The money paid out by the mortgagees was all paid directly to A and D was ignored throughout the transaction. The contract for the sale of its bricks by the plaintiff company was made with A who represented himself as being the builder and that the property was subject to ground rents, but the plaintiff company did not have notice of the real agreement between the parties. *Held,*

1st. That the original leases of the lots to D are valid, but in equity A must be regarded as the real owner of the leasehold and the builder of the houses.

2nd. That the mortgages of the leasehold by D are invalid as against creditors, whether regarded as indemnity mortgages or mortgages to secure future advances. If the latter, they are invalid because they do not comply with Code, Art. 66, sec. 2, as they specify neither the times nor the amounts of the sums to be advanced ; and if the former, they

are invalid because the alleged purchase of materials from A by D and the guaranty of payment therefor by the mortgagee were purely fictitious transactions, and no actual loss was suffered by the mortgagees under their guaranty, but the sums paid by them under the mortgages were in reality future advances to A in pursuance of the agreement, and the mortgages are consequently not liens for the sums paid.

3rd. That the natural result of the conduct of A in retaining title to the lots in D and causing the latter to create mortgages thereon for a feigned consideration, was to hinder, delay and defraud creditors like the plaintiff from whom A purchased materials used in the improvement of the lots.

4th. That the plaintiff company, although a subsequent creditor of A is entitled to maintain this bill to vacate said mortgages upon the two grounds of their being in violation of the statute regulating mortgages for future advances and of their tending to delay and hinder creditors of the real mortgagor, since plaintiff had no notice of the facts of the case when it became the creditor of A.

5th. That the land owners and mortgagees are not personally liable to the plaintiff company as partners with A in the scheme for developing the land, nor are the leases void as being part of a fraudulent scheme.

In the above case, after the advances to A had been partly made, one of the said mortgagees assigned his interest therein to one S who agreed to make the subsequent advances to A that the assignor would be called upon to make and S did accordingly make some advances thereafter. He had ample notice of the true character of the transaction between the original parties. *Held*,

1st. That S is not entitled to be treated as a purchaser for value of one-half interest in the mortgages without notice, but is an original creditor of A in the same manner as his assignor.

2nd. That the fact that S was advised by counsel that the mortgages were legal does not relieve him from the imputation of a knowledge of the real facts of which he had sufficient notice, and which showed that the guaranty set forth upon the face of the mortgages was a fictitious transaction.

Before the final hearing of this cause in the trial Court, an agreement was made between the parties by which both the fee and the leasehold estates in the 49 lots were released from the lien of the *lis pendens* and a bond was filed by the defendants conditioned for the payment of the plaintiff's claim if it should be decreed that the designated defendants are personally liable or that the mortgages are invalid as against the plaintiff *Held*, that a personal decree will not be entered against the defendants mentioned, since the agreement does not authorize it, and the bond stipulates for the payment of the plaintiff's claim in the event of the mortgages being declared void.

Appeal from a decree of the Circuit Court of Baltimore City (DENNIS, J.), dismissing the bill of complaint.

The cause was argued before McSherry, C. J., Fowler, Briscoe, Page, Boyd, Pearce, Schmucker and Jones, JJ.

*Edgar H. Gans* and *Vernon Cook* (with whom was *B. H. Haman* on the brief), for the appellant.

The *real transaction* appears from the testimony as follows:

(1) Amos was not a material man at all, but the real owner of the leasehold and builder, who was to build for Spalding and Singer, the latter to hold the ground rents and to have mortgages on the leasehold to secure such future advances as they might make to Amos, during the operation.

(2) Devilbiss was a mere figure head (a workman at twelve dollars a week), with no real interest whatever in the property. His name was introduced into the transaction to aid in carrying out the object of the real parties in a manner which would have at least the appearance of legality.

(3) This object was to enable Spalding and Singer to secure a mortgage lien for future advances, which they were to make. By such mortgages they were to gain priority over the material men.

(4) The plan was to avoid the effect of Article 66, sec. 2, Code, prohibiting such mortgages for future advances by giving the mortgages the form of indemnity mortgages, which are expressly excepted from the statute.

To create an indemnity mortgage, the most convenient method was to have a contract of guaranty, and to every guaranty there must be three parties. Hence it was necessary to introduce a third name into the transaction, since there were only two real parties to the same, Amos the builder, Spalding and Singer (in this sense one party), land owner. Devilbiss was brought in as this third party. He stands between the real parties. He nominally makes a double set of contracts. On the one hand, he is nominally to buy material of Amos, on the other hand, he is also nominally to build houses for Spalding and Singer. In reality, he never bought materials from any one and never built houses for any one. Spalding and Singer guarantee him to Amos, and Amos guarantees him to Spalding and Singer.

These three guarantees from Spalding and Singer to Amos are not real contracts at all, but merely formal papers used to give a nominal basis for the so-called indemnity mortgages. In fact, all of the papers signed by Devilbiss, or in which he is mentioned, were purely formal and not in any sense real contracts.

The appellant on November 1st, 1897, entered into a contract with Amos to furnish him two million bricks for the forty-nine houses to be erected on the property in question. This date it must be noted was *after* the first of the three mortgages, but *before* the second and third. The bricks were delivered from time to time, in accordance with the contract, but not one dollar has ever been paid the appellant though the houses have long since been completed and have doubtless yielded Spalding and Savage a handsome profit. Shortly after the execution of the formal papers mentioned it appears that Singer by an unrecorded paper agreed to assign all his interest in the three mortgages to the defendant Savage. These assignments were not actually executed until March 3rd, April 13th and 28th, 1898, respectively. The first assignment was also withheld from record for fifty days after its execution. The assignee, Savage, had full knowledge of all the circumstances of the transaction. On April 29th, 1898, the buildings being nearly completed, Devilbiss and Amos each made assignments for benefit of creditors. Singer at the same time was found to be bankrupt. Spalding and Savage then attempted to foreclose their mortgages on the leasehold and thus take away from the appellant the sole security for the payment of its claim. To prevent this injustice and fraud the appellant's bill was filed. It attacked the whole transaction as a fraud and the three mortgages in particular as illegal, fraudulent and void.

We ask the Court to decree that the three mortgages from Devilbiss to Spalding and Singer, and each of them, are invalid, fraudulent and void as against the appellant.

We ask this for three separate and distinct reasons :

(*a*) Because said mortgages have no true affidavit as to the consideration as required by the Code, Art. 21, sec. 30.

(*b*) Because said mortgages are in reality mortgages to secure future advances and are in violation of the Code, Art. 66, sec. 2.

(*c*) Because said mortgages are fraudulent and void under the Statute of Elizabeth against fraudulent conveyances.

(*b*) The three mortgages are invalid because in violation of Art. 66, sec. 2.  The attempt of the defendants is to sustain these mortgages on the ground they are indemnity mortgages, and that they therefore come within the exception allowed in the statute.  It is true that in form they are indemnity mortgages, but in reality they are not.  As we have seen from the testimony to which reference has just been made, the alleged guarantee by Singer and Spalding that Devilbiss would make certain payments to Amos was purely a formal and not a real thing and yet the defendants contend that the mortgages were to indemnify Singer and Spalding against any loss they might sustain by reason of having entered into said guarantee.  The real position of the parties was that Amos on the one hand was to build the houses.  Singer and Spalding on the other hand were to advance certain sums of money, and the object in preparing these mortgages was to make an arrangement by which Singer and Spalding might get a lien for said advances and yet not comply with the statute mentioned.  The attempt has been to do this by making the mortgage in the form of an indemnity mortgage, and to make it an indemnity mortgage they created a contract which is formal and not real, by which Singer and Spalding guarantee that Devilbiss will do certain things.  In other words, Devilbiss, who is a mere figure head in the transaction, is put between the two real parties.  Amos guarantees to Spalding and Singer that Devilbiss will build the houses.  Spaulding and Singer guarantee to Amos that Devilbiss will pay Amos for all materials which he, Amos, may furnish to said Devilbiss.  Each of the real parties therefore guarantees to the other party that Devilbiss will carry out his part of the transaction, thus showing that the position of Devilbiss is merely that of a nominal party, or a man of straw.  The real thing was, as stated, that Singer and Spald-

ing were to put up certain sums at certain times in the future, and were to get a lien for such advances. It was thoroughly understood that this was the real transaction.

The alleged contract of indemnity was merely a cloak to cover a mortgage in violation of the statute. This Court has always declared mortgages to secure future advances invalid, unless in strict compliance with the statute. *Harris* v. *Hooper*, 50 Md. 587; *Brown, Trustee,* v. *Stewart,* 56 Md. 431; *Laeber* v. *Langhor,* 45 Md. 477; *Estate of Young,* 5 Md. Chancery, 461.

The statute makes an exception in favor of indemnity mortgages. This, of course, can only mean real indemnity mortgages, not those which are put in the form of indemnity mortgages for the purpose of avoiding the statute. The difference between a mortgagee to secure future advances and an indemnity mortgage is that in the first case it is definitely understood that the mortgagee will certainly be called upon to make certain advances in the future. In the second case, it is not so definitely understood, but it is apprehended that the mortgagee may in certain events be called upon to make payments in the future, that is to say, ordinarily in the event of some one else, who has agreed to make a payment or to do some particular act, failing so to do, and in the event of this contingency the mortgagee is called upon to make good his default. Now, applying this distinction to the case, and reading Mr. Spalding's own evidence there was no uncertainty and no real contingency in this instance. Spalding knew from the first, not that he might be called on to make payments, but that he certainly would be compelled to make payments under his contract.

Some question could be raised both with regard to the objection to the mortgagee now under discussion, as well as to the objection to the insufficiency of the affidavit as to whether such a point should be raised by creditors who became such prior to the execution of the paper, or creditors who became such subsequent thereto. In this case, however, it makes no difference. The plaintff became a creditor subsequent to the

first mortgage, and prior to the second and third. Under the agreement and bond filed herein, if anyone of the three mortgages is declared invalid as against the plaintiff's claim, the defendants, Spalding and Savage, are to pay the full amount of his claim, and it is immaterial to the plaintiff then as to whether the first or the second or the third mortgage be declared invalid.

Mr. Savage seeks to rely upon the advice given him by his counsel. Advice of counsel in a matter of this kind will not protect the party who relied upon it, if the advice be unsound, as a matter of law. *Owings* v. *Rhodes*, 65 Md. 458.

It was also contended below that in order to take advantage of the alleged defect in the affidavits to the three mortgages mentioned in these proceedings, or in order to take advantage of the fact that said mortgages are advance mortgages and do not comply with the provisions of the Code, Art. 66, sec. 2, it was necessary that the plaintiff should be either a subsequent purchaser of the property, or the holder of a lien against the property, or else that the plaintiff should prove actual fraud as against the defendants. In reply to this we would say that the language of all the cases heretofore cited indicates that the statutes in question were intended for the protection of creditors as well as subsequent *bona fide* purchasers. The word "creditors" is used in several of the opinions. In no one of the opinions is the word "lien-holders" used, or the word "judgment creditors." We submit, therefore, that even a simple contract creditor could raise the point without proof of actual fraud. *Cockey* v. *Milne*, 16 Md. 200; *Denton* v. *Griffith*, 17 Md. 301; *Nelson* v. *Hagerstown Bank*, 27 Md. 51; *Phillips* v. *Pearson*, 27 Md. 256; *Sixth Ward Building Assn.* v. *Wilson*, 41 Md. 586.

*John Prentiss Poe* and *Joseph C. France* (with whom were *Willis, Homer & Smith* on the brief), for the appellees.

1. The so-called "fraudulent device" complained of in the bill is this : Amos was willing to secure the improvement of the vacant ground belonging to Spalding and Singer, but was

unwilling to assume the liability of lessee on the rent cove-
nants.   He offered one Devilbiss as a satisfactory person to
make the building contract and take the leases, and he agreed
to guarantee to Spalding and Singer that Devilbiss would
build and complete the houses according to  contract, if they
would become responsible to an  agreed  amount for building
materials, which he would furnish to Devilbiss, they to accept
as indemnity a mortgage from Devilbiss of the leasehold in-
terests.   At the time of these negotiations Spalding was, as
he still is, a man of ample financial responsibility ; Singer was
supposed to be such, and material men were *anxious* to sell
him ; Amos was in good credit and material men were *willing*
to sell him ; Devilbiss was a man of little means and more or
less the puppet of Amos, but this latter fact was  unknown to
Spalding, who uniformly dealt with him as a real party in in-
terest, requiring his orders and receipts for all moneys paid to
Amos.

2.  The documents evidencing the transaction were drawn by
Spalding's counsel and after the lease and mortgage covering
the first series of lots were recorded, Wilson, vice-president of
the appellant sought  out and on November 1st, 1897, made
a contract with *Amos* to furnish two millions of bricks for the
houses ; on the same day Wilson made a private agreement
with  Singer, of which Spalding knew  nothing, whereby, in
consideration of twenty.five cents per thousand bricks, Singer
gave the appellant his personal guarantee in writing of its
contract with Amos.

3.  In flat contradiction of the averments in the bill, namely :
that the use of Devilbiss, "a man of straw," as lessee was
a fraudulent device to deceive material men, Wilson not
only proved that his bricks were sold to Amos and not to
Devilbiss, but that he himself had been in the brick business
in Baltimore City from his youth up and was familiar with
bonus building and its methods.   More than this, the appel-
lant has been forced to abandon its charges that the mort-
gages were a sham and it is now conceded : (*a*) that Spalding
and the appellee, Savage, as assignee of Singer, have paid to

Amos under their guaranty for materials furnished to Devil-bill, $27,500; (b) that the indemnity mortgages under which the appellees paid out this sum have yielded on foreclosure only $8,100; (c) that in addition to the loss under the mortgages, the appellee, Spalding, is a creditor of Amos for money borrowed a day or so preceding his failure; and (d) that the insolvent condition of Singer, Amos and Devilbiss was unsuspected by the appellees, who had no previous notice or intimation of the making of their assignments.

4. Being compelled to admit that the appellees in good faith and with hard cash had lived up to the contract contained in the recorded indemnity mortgages, the appellant at the hearing below shifted its position from the case made out by the bill and argued for a decree declaring the mortgages to be invalid on technical grounds; the object sought being to put it in position to sue on the bond.

(5) a. It is difficult to understand the precise legal theory upon which the appellant bases its standing to attack the mortgages. It is confessedly not a creditor of Devilbiss, the mortgagor, because there is no theory upon which one dealing exclusively with a principal can hold the agent. If it be said that Amos was the real owner of the leasehold interests although Devilbiss held the legal title, then the mortgages must be treated as if made by Amos and he has received $27,500 under them. The appellant must either remain a stranger or adopt the transaction in its entirety. Each lease and the mortgage back constituted one transaction; and neither Devilbiss nor Amos ever had a vestige of interest in the property, legal or equitable, except subject to the mortgages.

b. But even if in some unexplainable way the creditors of Devilbiss can be disregarded and Amos be treated as the mortgagor, the appellant is neither a judgment creditor, nor the holder of any lien on the property, nor a subsequent purchaser. It has no standing, therefore, to attack the mortgages unless by proof of actual fraud. Except as provided by the Code, Article 16, section 39, a "creditor at large" cannot

*maintain a bill* to impeach any conveyance of his debtor, no matter how defectively executed. If the conveyance is good, as between the parties, third parties having no lien cannot impeach it at law, nor in equity, unless it is fraudulent. *Wanamaker* v. *Bowes*, 36 Md. 56.

*c.* It is difficult to see how any fraud was committed upon the appellant by putting the leases in the name of Devilbiss, even if he was known to be a mere figurehead. An owner of property, desiring to borrow money and at the same time avoid personal liability on the mortgage covenants, does not commit a fraud in law by transferring to a figurehead and having him make the mortgage ; and so far as the question of actual fraud is concerned the plaintiff is in *precisely the same situation* now as it would be if Amos had taken the leases. Its loss arises, not from the form of the transaction, but because the mechanics' lien law was repealed and Amos and Singer failed. Moreover, Wilson was bound to inquire into the state of the title (*Lenderking* v. *Rosenthal,* 63 Md. 28); the mortgage recorded before his contract with Amos disclosed exactly the transaction between Spalding, Devilbiss and Amos. "It is a contradiction in terms to say that a person is defrauded by an instrument when he deals with a perfect knowledge of its existence and of its effect. If our registration laws have any operation, they certainly do, as they were designed, give notice to all the world, so that there may be no deceit practiced upon anyone." *Williams* v. *Banks*, 11 Md. 250.

*d.* There being no actual fraud, the contention of the appellant that the affidavits to the mortgages were false ; and that they are in fact advance mortgages, notwithstanding their form, becomes immaterial. Even if they are mere nullities, the appellant is without standing in Court for three reasons :

(1) It is not a creditor of the mortgagor and whatever may be the rights of Amos to the mortgaged property as against Devilbiss, they cannot be asserted against the creditors of the latter, who dealt with him as lessee and owner and who are represented in this case by his trustee for the benefit of creditors ; (2) even if Amos can be treated as the real owner and

mortgagor, the appellant having no lien on the property cannot impeach the conveyance for defects in form or substance; (3) and if there is any creditor of Amos as to whom the mortgages are invalid and who is in position to assert their invalidity, the rights of such a creditor are represented by the trustee of Amos. *Textor* v. *Orr*, 86 Md. 392. The appellant is not only not claiming under Amos' deed of trust, but by the amended bill in this very case, it is seeking to have the same set aside as fraudulent.

*e.* But the mortgages are not invalid even as to the lien creditors of Devilbiss or of Spalding or of either of them. The guaranty given by Spalding and Singer to Amos created a real liability which any Court would enforce against the guarantors. But for the purposes of this case it would make no difference if the mortgages are regarded as mortgages to secure future liens or advances. The statute (Code, Art. 66, sec. 2), does not declare that advance mortgages are void or fraudulent; it simply restricts the beginning of the lien to the period when the advances are actually made and it is difficult to see how the appellant, if the mortgages are conceded to be advance mortgages, has on that account any ground for filing a bill in equity merely because he is an unsecured creditor of the mortgagor who, before the filing of the bill, has made an assignment for the benefit of creditors.

SCHMUCKER, J., delivered the opinion of the Court.

The bill in this case was filed by the appellant against the appellees to recover the sum of $13,682.85, being the price of certain bricks sold by it to the appellee, Amos, and used in the erection of buildings on forty-nine leasehold lots of ground in Baltimore city.

The bill as amended sought to subject to the payment of the plaintiff's claim both the fee-simple and leasehold estate in the lots of ground, and to that end to set aside the leases of the lots and three mortgages thereon from the appellee Devilbiss to the appellees Spalding and Singer, and the assignment by Singer of his interest in the mortgages to the appellee

Savage, and also to have Spalding, Singer and Amos all declared to be personally liable for the plaintiff's claim.

Those of the charges contained in the bill, which it is necessary for the purposes of this opinion to notice, are *first*, that Amos was the true owner of the leasehold estate in the lots and that Devilbiss in whose name the title stood had no interest in them, but held them solely for the benefit of Amos ; *secondly*, that Spalding and Singer the owners of the fee in the lots and Amos the true owner of the leasehold were jointly interested as partners in the erection of the houses and were the persons for whose benefit the bricks had been purchased and used ; *thirdly*, that the three mortgages on the leasehold from Devilbiss to Spalding and Singer were fictitious and fraudulent and without consideration, but were executed in pursuance of a fraudulent scheme on the part of Spalding, Singer, Amos and Devilbiss to procure the lots to be improved in value by the erection of the houses thereon at the expense of the appellant and other creditors who furnished materials for building the houses ; *fourthly*, that Savage the assignee of Singer had such actual and legal knowledge of the true nature of the mortgages as to make his title subject to the equities of the appellant.

The appellees Spalding, Singer and Savage all answer denying the charges of the bill so far as made against them respectively and asserting that the mortgages were *bona fide* and not fictitious or fraudulent and were made for the consideration therein set forth. Amos and Devilbiss also answer but they both admit that the former was the true owner of the leasehold in the lots and that the latter held the title thereto merely as an accommodation and for the benefit of the former. Devilbiss goes further and asserts in his answer that he was entirely ignorant of the contents and character of the leases, mortgages, agreements and other papers, relating to the lots or the erection of the houses thereon, which were from time to time signed by him, and that he signed them merely as a matter of accommodation to Amos, who was his employer, upon the assurance of Amos made through his foreman Slon-

aker that no trouble would arise from such signing.   He further averred that he had no interest whatever in the title to
the lots or in the erection of the houses thereon other than
that he had been employed to work on the houses at daily
wages as a carpenter, and that so far as he was concerned the
recitals of the three mortgages were fictitious and untrue.

The appellant called all of the appellees as its witnesses except Spalding who went upon the stand as a witness for the
appellees, so that we have before us the versions of the transaction given by the various participants in it.   The testimony,
with the exhibits produced in evidence, fills nearly five hundred pages of the record, and we cannot in this opinion do
more than state the conclusions at which we have arrived
after carefully examining it, with a brief reference to some of
the more material parts of the evidence upon which they
are based.   We find the substantial facts of the case to be as
follows :

Spalding and Singer owned as tenants in common a large
lot of vacant ground at the corner of Twenty-second street
and the York turnpike on the outskirts of the improved portion of Baltimore City.   For the purpose of marketing this
property to advantage they divided it into forty-nine small lots
about fifteen feet wide, upon each of which they placed a
ground rent of from $120 to $150 per annum, and entered
into a bonus building operation with Amos to improve the
leasehold estate in each of the lots by the erection of a dwelling thereon.

As an inducement to him to undertake the improvement of
leaseholds charged with such heavy rents they agreed to donate to him as a bonus a certain sum of money for each
house, amounting in all to $40,000, to be paid in seven instalments as the work on the houses progressed.   They also
agreed to advance further sums toward the payment for materials to be used in the construction of the houses, amounting in all to $35,800.   The $40,000 bonus was to be an out
and out contribution by Spalding and Singer toward the erection of the houses and was not to be returned to them, but

the $35,800 was to be in the nature of a loan to be secured by mortgages upon the houses.  Amos was unwilling to become lessee of the forty-nine lots because of the personal liability he would have to assume under the covenants in the leases for the payment of the rents, and so it was agreed that the leases creating the rents might be made to Devilbiss who had consented to act as lessee and was not financially responsible.

There was nothing new or unusual in having the leases in a bonus building operation made to one who is a figure head instead of to the real lessee, in order to enable the latter to avoid the continuing responsibility for the payment of the rent which the law imposes on the lessee under his covenants.  The evidence shows that has long been customary in bonus building in Baltimore City and it is a practice which might naturally be expected to arise out of the state of facts incident to such transactions.  If in the present case after the leases had been made to Devilbiss he had assigned the leasehold to Amos before Amos began to build the houses thereon and contract debts for that purpose, the professed purpose of using Devilbiss as the formal lessee would have been fully accomplished, and the arrangement would not have injuriously affected the rights of any third parties.

At the time when this building operation was undertaken the mechanic's lien law was still in force in Baltimore City and it became important for the parties to the operation to devise or arrange some plan by which mortgages, to secure the $35,800 to be advanced toward the purchase of building materials, could if possible be placed upon the property in such manner as to become an immediate lien and thus take precedence of any liens of mechanics and material men which might otherwise attach to the property before the monny was advanced.  Prior to the passage of the Act of 1882, ch. 471, a mortgage could have been put upon the lots, before the commencement of the buildings, to secure advances of money thereafter to be made to the builder and its lien would have attached to the property from the date of its execution, but since the passage of that Act the case has been different.

Sec. 2 of Art. 66 of the Code, as it has stood since the passage of the Act of 1882, provides that "no mortgage or deed in the nature of a mortgage shall be a lien or charge for any sum or sums of money to be loaned or advanced after the same is executed except from the time said loan or advance shall be actually made; and no mortgage to secure future loans or advances shall be valid unless the amount or the amounts of the same and the times when they are to be made shall be specifically stated in said mortgage; this not to apply to mortgages to indemnify the mortgagee against loss from being endorser or security * * * *." Such was the state of the law when the leasing and improving of these lots of ground was undertaken.

The whole forty-nine lots were not included in one set of conveyances, they were divided into three groups one of seventeen and the other two of sixteen lots each; and a separate set of papers, lease, mortgage, bonus agreement, &c., were executed for each group. These three sets of papers were made between the same parties and were identical in their terms. They were all prepared at once and were all executed at the same time by the lessee and, so far as the principles involved in this appeal are concerned, the entire undertaking may be discussed as a single transaction.

Amos had frequently before conducted bonus building operations and in some of them he had used a builder named David C. Slonaker as a formal lessee and when he determined to embark upon the present one he applied to Sloanaker to again act for him as lessee but Sloanaker refused because he thought, as he said upon the witness stand, that "it was not a safe job." He however procured Devilbiss, who was a pecuniarily irresponsible laborer and carpener, to act for Amos as lessee of the lots, upon the assurance that he would get into no trouble by doing so. Devilbiss being thus assured executed not only the leases and mortgages but all other papers which it was appropriate for the lessee of the lots to execute in the plan which was adopted for procuring the erection of the houses.

That plan was as follows : For each group of lots a lease for ninety-nine years, in usual form, creating the ground rents was made by Spalding and Singer and their wives to Devilbiss. On the same date other papers relating to the same lots were executed as follows :

*First. An agreement* stipulating that Devilbiss would erect a dwelling of a specified character on each lot and that Spalding and Singer would for the purpose of assisting him in the erection of the houses pay absolutely to him the bonus therein stated in seven instalments at specified stages in the progress of the buildings. Amos endorsed on this agreement a guaranty of its performance on the part of Devilbiss.

*Second. An agreement* between Amos and Devilbiss by which the former agreed to sell to the latter all of the materials required for the erection of the houses and the latter agreed to procure Spalding and Singer to guarantee, to the former, payment for such materials to a specified extent amounting to about seven hundred dollars per house.

*Third. A guaranty* from Spalding and Singer to Amos of the payment by Devilbiss of the price of materials, to the extent above mentioned, to be sold to him.

*Fourth. An order* on Spalding and Singer from Devilbiss to pay to Amos "all sums of money due on account of my agreement with you for an advance in and about the erection of" the houses.

*Fifth.* A mortgage upon that particular group of the houses from Devilbiss to Spalding and Singer which is one of the three mortgages that the bill asks to have set aside and declared void.

Each of these mortgages recites that it was made to secure a present indebtedness from Devilbiss to Spalding and Singer of a specified amount maturing at one year from date, (the amount being equal to the total extent of their guaranty to Amos for material to be used in the houses on the lots described in that mortgage) and also to indemnify Spalding and Singer against loss under their guaranty to Amos of payment for building materials to be sold by him to Devilbiss. The

defeasance is conditioned upon the payment to the mortgagees of the present indebtedness recited in the mortgage and also the protection of them from future loss by reason of their guaranty. The form of these mortgages led the appellants to contend that they were respectively intended to charge the several groups of houses with an antecedent indebtedness of Amos in addition to making them liable to indemnify the mortgagees for any loss they might thereafter sustain by reason of their alleged guaranty, but we think the evidence es-- tablishes the fact that the two recitals in the mortgages refer to the same obligation which was in fact to secure the return to the mortgagees of such sums of money, to the extent therein mentioned, as they should thereafter advance to the builder of the houses in the course of the construction thereof.

The form of these papers would indicate to those who read them that Devilbiss was the real lessee of the lots and builder of the houses and that Amos was a material man who had made a *bona fide* contract to sell him the materials for their erection, and that Spalding and Singer had in reality guaranteed to Amos payment to a certain extent for these materials. The evidence satisfies us that the true transaction was not the one indicated by the papers, but it was such as we have stated it to be in the earlier part of this opinion.

Devilbiss swears in the most positive manner that he merely signed the various papers bearing his signature at the request of Amos made through Slonakar and was absolutely ignorant of their contents ; that he did not erect the houses or have any interest whatever in them except that he was paid two dollars a day for his labor thereon as a carpenter ; that he never purchased any materials from Amos or requested Spalding and Singer to guaranty payment for any, but that Amos was the real lessee of the lots and builder of the houses.

Slonaker, who had for some years been engaged with Amos in building operations and who superintended the erection of the houses now under discussion, testified that he was employed by Amos and that Devilbiss had no connection with the transaction except that he was employed on the houses as a

carpenter at two dollars a day.    Slonaker further testified that
Amos had applied to him to become the nominal lessee of the
lots, but he had declined because he thought it unsafe to do
so and that he had induced Devilbiss to act as lessee for Amos.

Amos himself testified most positively that "he was the
real man" in the whole transaction and that "Devilbiss was
just an actor in it."    That the papers in which Devilbiss' name
appears were "just formal papers."    That he used Devilbiss
" for convenience sake " and that the latter signed whatever
papers he was asked to sign and that wherever Devilbiss' name
appeared therein Amos' name would properly appear.    He
further testified that he never had any negotiations with Devil-
biss in reference to building materials and never sold him any
materials, and that the professed sale of materials referred to
in the papers was but a part of the formal transaction, and
that the mortgages were in fact intended to secure advances
which were to be made upon the houses, as he said, in suc-
cessive instalments simultaneously with the payments of the
bonus.

Singer admitted on the stand that his transactions concern-
ing these lots and houses were entirely with Amos and that
he had no transactions with Devilbiss in reference to them,
that Devilbiss did not owe him a dollar when the mortgages
were made or at any other time and he had no recollection of
his ever asking him to become his surety.    Spalding admitted
in his testimony that he knew Devilbiss had no money and
that he never expected him to pay for the materials used in ·
erecting the houses.    It also appears from the evidence that
although $32,700 were paid out under the bonus agreement
between Spalding and Singer and Devilbiss all of it was paid
to Amos under the orders of Devilbiss and the latter was
practically ignored in the whole transaction after the papers
had been signed.

It further appears from the evidence that Spalding, Singer
and Amos occupied adjoining offices in the same building and
that Singer and Amos had been associates from childhood
and that all of them had been previously engaged either sepa-

rately or together in many bonus building operations in Baltimore City and must have been quite familiar with the details of such transactions.

Under these circumstances it would involve too great a tax upon our credulity for us to treat Devilbiss as the true lessee of the forty-nine lots, or as a real party to the various written instruments to which his signature is appended, or to treat the three mortgages in question as having been in fact intended to indemnify Spalding and Singer as guarantors of Devilbiss. On the contrary we are satisfied that Devilbiss was a mere man of straw in the whole business and that Amos was the real man and was known to and dealt with by Spalding and Singer as such, and that in equity Devilbiss must be treated as a mere trustee holding the title for Amos who must be regarded as the real owner of the leaseholds and builder of the houses thereon and the real party instead of Devilbiss to such of the papers and conveyances already referred to as are valid and binding instruments. As we have come to the conclusion that the alleged purchase of materials from Amos by Devilbiss and the guaranty by Spalding and Singer of the payment therefor were not real but were fictitious transactions it follows as a matter of course that the three mortgages under consideration are invalid.

Nor can we agree with the learned Judge below that, even if the three mortgages in the present case be regarded as advance mortgages, they fully comply with the statutory requisites as to such mortgages and are therefore valid. In our opinion they fall far short of a compliance with the requirement, of sec. 2 of Art. 66 of the Code, that the amount or amounts of the advances and the times when they are to be made shall be *specifically stated* in the mortgage. If it be true, as was testified by Amos, that the understanding between the parties was that these advances were to have been made in seven instalments simultaneously with the payments of the bonus, the mortgages totally fail to comply with the law as they specify neither the times nor the amounts of the payments. If on the other hand we attempt to apply the re-

citals in the mortgages, touching the liability of the mortga-
gees for materials under their alleged guaranty, to the future
advances to be made by them to Amos the mortgages still
fall far short of the requirements of the law, for the only things
specified in them are the outside limit of the guaranty for ma-
terials and the portion thereof to be applicable to each house
without giving any information as to the important element of
the times at which the advances are to be made.

As the earlier part of sec. 2, of Art. 66 provides that no
mortgage shall be a lien for any sums of money to be loaned
or advanced after its execution except from the time such loan
or advance shall be actually made, it becomes necessary to
insist upon a strict compliance with the next clause of the sec-
tion which requires all such mortgages to *specifically state* the
*amounts of the advances and the times when they are to be made*
in order to enforce the obvious policy of the law upon that
subject which is to afford to the public, when about to deal
with the mortgaged property or its owners, accurate and reli-
able information as to the extent of the liens thereon and the
times from which they become effective. The mortgages
having been in fact intended to secure future advances and
failing to comply with the positive requirements of the section
last referred to of the Code they are under its express provi-
sions altogether invalid.

We think that the appellant as a subsequent creditor of
Amos, whom we have held to be in equity the real mortgagor
in this case, was entitled to institute this suit to set the mort-
gages aside. In the cases of *Warner* v. *Rice*, 66 Md. 437;
*Brown* v. *Macgill*, 87 Md. 161, and *Scott* v. *Keane*, 87 Md.
709, subsequent creditors of the grantor were permitted to
assail conveyances that were held to be void because against
the policy of the law without reference to the real motives of
the grantors in making them. There is at least equally strong
ground for holding that the appellant as a subsequent creditor
is entitled to assail the mortgages in this case which are con-
trary to the express provisions of the statute law.

We also think that the natural result of the retention in

Devilbiss of the leasehold title to the lots and the execution by him of the mortgages thereon at the request or with the connivance of Amos, when the latter intended to contract as he subsequently did contract debts for materials with which to build the houses, was to hinder, delay and defraud the creditors of Amos and the mortgages were void for that reason without reference to the opinion which their authors may have had as to their right to make them, and the appellant although a subsequent creditor was entitled upon that ground also to file the present bill to set them aside. *Williams* v. *Banks,* 11 Md. 199; *Moore* v. *Blondheim,* 19 Md. 175; *Matthai, Ingram & Co.* v. *Heather,* 57 Md. 484; *Folsom* v. *Deitrick Fertilizer Co.,* 85 Md. 70.

Although Singer was tenant in common with Spalding of the vacant lot, and of the forty-nine ground rents into which it was converted by the leases, and he agreed to furnish one-half of the money to be advanced under the mortgages, he was pecuniarily unable to meet his engagements in that respect. He accordingly entered into three written agreements with the appellee Savage each of which recited the making of one of the mortgages and Singer's desire to provide the money to meet his one-half of the amount to be supplied by the mortgagees and then stipulated that Savage would from time to time "*furnish him with the sums so to be advanced*" and Singer would assign his one-half interest in the mortgage to Savage as security. The mortgage was assigned by Singer to Savage and the latter from time to time as required furnished the money for Singer's one-half of the advances that were made, and he claims a lien under the mortgages on the leaseholds for the money thus supplied by him.

It was urgently contended on behalf of Savage that he was entitled to be treated as a purchaser of these mortgages for value without any notice to put him on inquiry as to the fictitious character of the guaranty transaction recited in them, but the facts of the case do not sustain the contention. He is in fact not an assignee of the claim which he asserts but is the original creditor. There was nothing due to Singer under the

mortgages when he entered into the agreement to assign them
to Savage and the entire claim of the latter is for money which
he himself advanced after the making of the agreement and
apparently after the assignment to him of the mortgages.

Even if he be treated as an ordinary assignee the record
shows that he had ample notice of the character of the trans-
action in which he was about to embark to put him on inquiry
as to its true nature.   He was no novice in the business of
creating ground rents and giving them value by procuring the
erection of houses upon the leaseholds.   He had been in such
transactions with Spalding and had financed a number of bonus
building operations for Singer before the present enterprise was
undertaken.   The agreement in pursuance of which he pur-
chased the present mortgages informed him as to their nature.
He testified that the arrangement between Singer and him as
to providing the money was "That I would take hold of the
mortgages and as the work progressed pay them from time to
time, that was, as I understand, as the first, second and third
floors, or whatever it was were ready."   He further explained
in his testimony that, Singer would send him word when the
buildings had progressed to the stages at which the several
instalments of the advances were due and he would give the
money to Singer and trust him to make the proper disposi-
tion of it.

Now if Savage relied upon the recitals contained in the
mortgages he knew that by purchasing them he practically
assumed the position of co-surety with Spalding for Devilbiss
and that he could in no event claim a lien on the mortgaged
lots except for such of Devilbiss' debts for material used in
erecting the houses as the latter failed to meet and he was
thus compelled to pay.   Yet he admitted that, although he
was entirely unacquainted with Devilbiss and would not know
him if he saw him, he paid the various instalments of the
mortgage advances to Singer whenever the latter told him
they were due, without making any investigation as to the
genuineness of the alleged guaranteed debt for which they
were intended or ascertaining whether Singer applied the

money to the payment of such debt. The record shows that in fact Singer applied the advance money thus received from Savage to the payment of those of his own debts which were most pressing without reference to their origin.

Counsel for Savage relied also in the argument upon the fact that before he purchased the mortgages he required them to be submitted to his counsel, an estimable and capable member of the Baltimore bar, and was advised by him that they were legal and good. This advice was doubtless given upon the assumption that the guaranty set forth in the mortgages was a real and not a fictitious transaction, but in any event the advice of counsel would not relieve a client from his mistake in failing to make a proper investigation into a state of material facts of which he had sufficient notice to put him on inquiry. *Owings* v. *Rhodes*, 65 Md. 417.

The circumstances under which the appellant through its manager Wilson, made the sale of the bricks indicate that he knew at the time of making the sale that the lots on which the houses were to be erected were leaseholds and the amount of the rents to which they were liable. The sale was made to Amos who represented himself to be as he in reality was, the builder of the houses. Singer informed Wilson that Amos was about to build the houses, and he agreed for a consideration to guarantee the payment for the bricks, but there is nothing in the record to indicate that the appellant supposed that the sale was being made to Spalding and Singer as partners. The appellant has therefore no equity to have the ground rents subjected to the payment of its claim or to hold Spalding and Singer personally liable therefor as partners. Singer may be individually liable to him under his guaranty, but this suit was not brought to enforce that liability.

Nor do we think that the leases of the lots should be declared void because, as is claimed by the appellant, they formed part of a scheme concocted by Spalding and Singer to procure their lots to be improved at the expense of the material men and thus defraud their creditors. The lease of each group of lots was placed on record before the erection of the

houses thereon and the public were thus informed as to its existence and terms.    Moreover it was the duty of material men and others dealing in respect to the erection of the houses to ascertain the rights and conditions upon which the purchaser held and improved the lots.    *Lenderking* v. *Rosenthal,* 63 Md. 28.    If he had pursued his inquiry in this case to the point of ascertaining Amos' true interest in the lots he would have found it to be only a leasehold.

Although we have declared the three mortgages on the leasehold in the lots invalid and void for the reasons given by us we do not agree with the appellant's contention that the whole plan adopted for the leasing and improving the lots is to be regarded as a fraudulent one contrived by Spalding, Singer and Amos to defraud those who should thereafter become their creditors.    It does not appear that Spalding and Singer contemplated incurring any debts when the plan of leasing and improving the lots was adopted.    It certainly made no difference to them whether they leased the lots to Amos directly or to Devilbiss for his benefit except that by the latter plan they lost their recourse to Amos under the covenants of the lease.    If they were willing to relinquish his personal liability for the performance of those covenants that furnishes no ground of complaint to the appellant.

It appears from the record that before the houses were completed both Amos and Devilbiss failed and before the filing of the bill in the present case each of them made a deed of trust for the benefit of creditors to the appellee, H. C. Gaither. The *bona fides* of these deeds was called in question by the appellant in the course of the argument, but we see nothing in the record to affect their integrity.    It is alleged in the bill and admitted in the answer of the trustee Gaither, that one John Fishach had filed a bill in the Circuit Court of Baltimore City against Devilbiss and Gaither as his trustee, averring that it would be to the advantage of Devilbiss' creditors that receivers be appointed to complete the houses and that receivers were accordingly appointed by the Court in that proceeding to take charge of and if necessary complete them, but we are

not informed as to the scope or present status of that pro-
ceeding nor as to the exact terms of the deeds of trust of
which no copies appear in the record.

It also appears from the record that before this case came
to a final hearing in the Court below the appellant entered
into an agreement with Spalding and Savage that an order
should be entered by the Court releasing and discharging
both the fee and leasehold estates in the forty-nine lots from
the lien of the *lis pendens* created by this case provided a bond
with sureties to take the place of the property should be filed
by Spalding and Savage to be approved by the Court for the
payment in full of the appellant's claim if it should be decreed
in this case either that Spalding was personally liable for the
claim, or that the ground rents of any of them were invalid,
fraudulent or void against the plaintiff, or that the three mort-
gages on the leaseholds or either of them were invalid, fraud-
ulent or void as against the appellant.   It further appears that
a bond was filed and approved as contemplated in the agree-
ment and that with leave of the Court an order was filed in
the case by the appellant's solicitors releasing the fee and
leasehold estates in the lots from the operation and effect of
the proceeding in this case.   The appellant in his brief asks
that, if we should reach the conclusion at which we have ar-
rived as to the invalidity of the mortgages, we direct a decree
to be entered against Spalding and Savage, under the agree-
ment just mentioned, for the full amount of its claim and in-
terest, but the agreement contains no provision authorizing the
entry of such a decree in this case although both the agree-
ment and the bond provide that in the event of the mortgages
being declared void by this Court the obligors will pay to the
appellant on demand the full amount of its claim with interest.

Our conclusions are :

1st. That the leases of the forty-nine lots from Spalding and
Singer to Devilbiss are valid but the demised lots were affected
in his hands with a resulting trust in favor of Amos for whose
benefit they were made.

2nd. Spalding and Singer are not personally liable for the

appellant's claim as partners in the scheme for developing the land, not intending however by this decision to affect or impair Spalding's obligation to the appellant under the bond filed in this case.

3rd. The three mortgages from Devilbiss to Spalding and Singer on the leasehold in the lots are invalid and void.

4th. The assignment of Singer's interest in these invalid mortgages to Savage gave him no lien upon the mortgaged property.

The decree appealed from will be reversed and the cause remanded for further proceedings in accordance with this opinion.

*Decree reversed with costs and cause
remanded for further proceedings.*

(Decided June 19th, 1902.)

A motion for a re-argument was subsequently made and in overruling the same

SCHMUCKER, J., delivered the opinion of the Court.

Since the filing on June 19th of our opinion in this case the appellees have made a motion for a re-argument. In the brief filed in support of their motion they contend that we reached the wrong conclusion both as to the character and effect of the three Devilbiss mortgages and as to the right of the appellant to maintain the suit.

They urgently insist that the mortgages constituted valid liens upon the mortgaged property for the sums of money amounting in all to $27,500 paid by Spalding and Singer to Amos during the erection of the buildings, whether the payments are to be regarded as having been made on account of purchases of material from Amos by Devilbiss or to be treated as future advances to Amos. To this contention we cannot yield our assent.

We are satisfied from the evidence appearing in the record that there were no real and *bona fide* purchases of materials from Amos by Devilbiss, but that the $27,500 were in reality

future advances to Amos and that the purchases and guaranty
set forth in the mortgages consisted of merely formal acts per-
formed in execution of a scheme devised for and employed in
an attempt to evade the provisions of the Code relating to ad-
vance mortgages.    No actual loss *under a guaranty* was suf-
fered by Spalding or Singer from those transactions and they
therefore cannot claim a lien under their mortgages for any
loss of that description.

On the other hand the mortgages, which were deliberately
drawn by the mortgagees' counsel in a form of their own se-
lection, do not on their face profess to secure the repayment
of future advances of money apart from any purchase of mate-
rials, nor could they, without doing violence to their own
statements, be so construed as to bring such advances within
their operation.    Furthermore. as we have already said in our
opinion now on file, the mortgages, treated as advance mort-
gages, are condemned as void under the statute for failure to
specifically state the amounts of the several advances and the
times when they were to be made.

Our conclusion as to the necessity, since the Act of 1882
amending sec. 2 of Art. 66 of the Code, of this specific state-
ment in an advance mortgage is in no sense inconsistent with
the cases on which the appellees rely in that connection to
support their motion.    The cases which they cite of *Cole* v.
*Albers*, 1 Gill, 412, and *Brooks* v. *Lester*, 36 Md. 65, were both
decided prior to the Act of 1882, and in the case of *Rosen-
stock* v. *Ortwine*, 46 Md. 388, which was decided since the Act
of 1882 the mortgage on its face specifically stated the amount
($250) of each advance and the time when it was to be made,
*i. e.*, one payment when each successive floor of joists was
laid on the house, &c., with exact precision throughout.    Nor
are we able, in holding the mortgages now under considera-
tion legally ineffectual to secure to the mortgagees a lien for
the $27,500 advanced by them, to treat those instruments as
good equitable mortgages for the advances on the ground that
the money had been actually paid and thus uphold the appel-
lee's claim to a lien, for to do so would be to exercise our

equitable powers to defeat not only the policy but the positive provisions of the statute law.

The appellees are of course creditors of Amos for the advances made by them to him but the repayment thereof was not secured by these mortgages.

The second contention of the appellees is that the appellant as a subsequent creditor of Amos cannot impeach the mortgages because

(*a*) The record contains no proof of actual fraud in their creation ;

(*b*) The appellant had both actual and constructive notice of their existence when it sold the bricks to Amos.

Subsequent creditors in order to impeach a conveyance of their debtor on the ground that it was made to hinder, delay or defraud them must show the existence of an intention to accomplish that purpose but such intention need not be proven as an independent fact.   It is to be gathered from the deed itself and from the acts of the parties and the surrounding circumstances.   The law conclusively presumes every man to intend the necessary and even the probable consequences of an act deliberately done.   *Gardner* v. *Lewis*, 7 G. 404; *Whedbee* v. *Stewart*, 40 Md. 424; *Ecker* v. *McAllister*, 45 Md. 309; *Lineweaver* v. *Slagle*, 64 Md. 489; *Gephart* v. *Merfield*, 51 Md. 325.

We have already said that in our judgment the natural and probable result of Amos' conduct, in retaining the title to the lots, upon which he was about to erect buildings, in the name of Devilbiss and procuring the latter to encumber the lots with mortgages made for what was in effect a feigned consideration, was to hinder and delay and thus to defraud subsequent creditors like the appellant from whom Amos purchased the bricks with which to build the houses.   In fact such was the necessary consequences of making the mortgages because the creditors were in any event put to the delay and expense of instituting and conducting proceedings in equity to avoid the mortgages in order to subject the mortgaged property to the payment of their debts.   We think no further proof of intention was required.

In the group of cases commencing with *Banks* v. *Williams,* cited in our opinion already filed, our predecessors have repeatedly held that when a voluntary conveyance is made with a view or expectation of becoming subsequently indebted and in accordance with such view or expectation debts are contracted those who thus become creditors may avoid the deed although their claims had not at its date even a contingent existence. In *Folsom* v. *Detrick Fertiliser Co.,* 85 Md. 52, the most recent of the cases there cited, the same doctrine was applied to a deed which was not a voluntary one because it formed part of a transaction, made by its grantor with a view to continuing in business and contracting future debts, which tended to injure future creditors by withdrawing his assets from their reach. We think the doctrine of those cases is also applicable to the appellant's right to assail the mortgages now under consideration which should be allowed no greater effect than voluntary conveyances because the alleged purchases of material by Devilbiss, in respect to which they profess to indemnify the mortgagees as his guarantors, had no real or *bona fide* existence, and the mortgages are not legally valid or sufficient to secure future advances.

The remaining substantial contention of the appellee's brief is that the appellant cannot maintain its suit because it had "actual knowledge" of the mortgages "brought home to it by the clearest and most emphatic testimony." Of course if the appellant had actual knowledge of the true transaction between the appellees and of their real relation to each other when it sold the bricks to Amos it acted with its eyes open in making the sale and cannot now be heard to complain that the transaction was fraudulent as against it. But the record does not seem to us to establish the fact of such notice. Amos does testify that about the time he purchased the bricks he told Wilson, in Singer's presence, that he was going to put the lease in a man named Devilbiss and that there would be an indemnity mortgage on each property for the amount of the materials furnished. Singer, although on the stand after Amos had testified, was not interrogated in reference to this

alleged notice and gave no testimony on that subject. Wilson testified positively that when he sold the bricks he did not know that Devilbiss had any interest in the transaction or that any leases to him had been put on record or any building permits issued in his name, that he did not know Devilbiss and had never seen him until after the institution of this suit, and that Singer informed him that Amos was going to erect the buildings.  In view of this testimony and the fact that the written offer to sell the bricks was addressed to Amos and bears his acceptance at its foot and that the bricks were charged to him on the appellant's books and he gave his note for the purchase money for them we do not think that the evidence establishes the fact of actual notice to the appellant of the real transaction represented by the mortgages.

The constructive notice resulting from the recording of the mortgages was at most only notice of the transaction set forth therein which was merely a formal and not a real one, and such constructive notice was not sufficient to bar his right to impeach them as tending to hinder, delay or defraud subsequent purchasers.  *Diggs* v. *McCulloh*, 69 Md. 610; *Scott* v. *Keane*, 87 Md. 723.

The appellees, while admitting that no judgment or lien is necessary to enable the appellant under Art. 16, sec. 46 of the Code, to attack the mortgages in equity upon the ground that they were intended to defraud creditors, question his right to do so upon the mere ground that they were void under the statute and call our attention to the fact that in each one of the three cases cited in that connection in our opinion the plaintiff had either a legal or an equitable lien upon the property.  They further call our attention to the fact that the statutory illegality of the mortgages if they be regarded as intended to secure future advances was not set up or relied on in the bill of complaint.

It is not necessary for the purposes of this opinion to determine the right in general of a subsequent creditor without a lien to impeach the conveyance of his debtor upon the sole ground that it is void under a statute, because other grounds

sufficient to authorize the Court to annul the mortgages under consideration are set up in the present bill, and when, in the course of a proceeding properly instituted to impeach a conveyance, it appears that the deed is one condemned by a statute, the Court will *sua sponte* take notice of such illegality and will upon that ground set the deed aside whether its illegality was or was not set up or relied upon in the pleadings.  *A. & E. Encyclo. of Law*, 2nd ed. , vol. 15, pg. 1015; *Fowler* v. *Scully*, 72 Pa. St. 466–7; *Clafflin* v. *Credit System*, 165 Mass. 503; *Richardson* v. *Bahl*, 43 Wis. 661.   The Courts will not sanction any transaction or conveyance made in contravention of a statute.  *Wait on Fraudulent Conveyances*, sec. 324; *Jaffary* v. *McGhee*, 107 U. S. 361.

*Motion overruled.*

(Decided October 31st, 1902.)