## William J. Cole *vs.* Anthony Albers and Theodore Runge.—*December* 1843.

To vacate a deed by the insolvent laws existing anterior to the act of 1834, ch. 283, the grantors, at the time of executing the deed, must have contemplated taking the benefit of the insolvent laws; otherwise, the deed could not therefore be condemned as made with a view or under an expectation of being and becoming an insolvent debtor, and with intent thereby of giving an undue and improper preference.

A deed made at the request of the creditor, prior to the act of 1834, was not within the meaning of our insolvent laws.

The act of 1834, ch. 293, so far it authorises the courts to vacate conveyances made in contemplation of insolvency, is a local law confined to the city and county of *Baltimore*, and does not apply to cases where the grantee had not notice of the insolvent condition of the grantor.

Where, after the execution of a deed of mortgage, the mortgagor lent money and sold goods to the mortgagee, and took notes for the payment of his debt, in semi-monthly instalments, this is evidence that he did not know his debtor to be in an insolvent condition.

The notice required by the act of 1834, to vitiate a conveyance is not a technical or constructive notice, but an actual notice derived from a knowledge of the condition of the grantor of such conveyance.

At common law a debtor has a right to prefer one creditor to another, and, independent of our statute in relation to insolvent debtors, may give such preference.

Evidence cannot be admitted which would have the effect of changing the character and legal operation of a deed.

When a deed purports to have been made on a monied consideration, it cannot be shown that money did not constitute the consideration; where a deed is impeached for fraud, and the consideration stated is money, it will not be allowed to set up a different consideration as marriage to support the deed.

Where the consideration stated in a mortgage is a sum of money in hand paid, and it is taken to secure that sum, evidence is admissible to show a part of the sum paid, and that it was to secure advances made, and to be made, to that extent. Such evidence would not affect the nature of the deed. It would still be founded on a money consideration.

Such evidence is also admissible to rebut the idea of fraud, by showing the same kind of consideration, differing only in amount, and the circumstances under which it assumed this shape.

The design of the act of 1825, ch. 50, was to prevent liens on property to the prejudice of creditors, for amounts and claims never contemplated by the parties at the time of the execution of their mortgage, of which the mortgage, by its terms, gave no notice.

A deed executed to cover a mortgage against all future liabilities of any and every description, which the mortgagor might incur or be responsible for to the mortgagee, would be within its provisions.

APPEAL from the Court of Chancery.

The bill in this cause was filed on the 11th February, 1841, by *William J. Cole*, and alleged that before the 1st September, 1839, *Charles Brecht*, of the city of *Baltimore*, merchant, was indebted unto *Albers and Runge*, of *Baltimore*, as copartners, and various other persons in said city, in large sums of money, was actually insolvent; and which insolvency was known to said *Albers & Runge;* that on the day above mentioned *C. B.* formed a copartnership with one *Frederick Uthoff*, also of said city, and that the said *C. B.* then had a stock of goods of some value, which passed to himself and the said copartner, and that the said partnership took upon themselves the debts of the said *C. B.;* that at the time said partnership was formed the said *F. U.* had a capital of $3,240, the whole of which was paid to *Albers & Co.* on account of their said claim against *C. B.*, whereby the claim of *A. & Co.* against *C. B.* was reduced to $1,286.62, and the new firm of *B. & U.* was rendered actually insolvent when they commenced business, but which was kept secret from the then creditors of the said *C. B. & Co.;* that on the 2nd December, 1839, *C. B. & Co.*, then being actually indebted to *A. & Co.* in the sum of $4,753.08, including the above balance of $1,286.62, and no more, and being then actually insolvent, and intending to give the said *Albers & Co.* an undue, illegal and improper preference, and in fraud

of the rest of their creditors made to the said *A. & Co.* a bill of sale for all the goods, merchandise and furniture then remaining, standing and being in the store No. 95, in *Baltimore* street, and then in occupation of the said *B. & U.*, as is therein specified, and also of all the outstanding promissory notes and other evidences of debt belonging to them, or either of them, and all future proceeds and avails arising from sales of the goods of said store, for the professed consideration of the sum of $10,000 in hand paid, when, in truth and in fact, no such sum of money, nor any part thereof, was paid, and there was not any other consideration than the above mentioned balances of account, and that the said pretended consideration was inserted further to deceive and defraud their creditors, and to give to the said *A. & Co.*, an undue, illegal and improper preference.     The said bill further alleged that on the 1st September, 1840, or about that time, the said *F. U.* and the said *T. R.*, (their respective partners *C. B.* and *A. A.*, then being in *Europe*, where the said *A. A.* now resides,) contriving and intending how further to injure and defraud the creditors of *C. B. & Co.*, agreed together that the said *T. R.*, by virtue of the bill of sale herein before mentioned, should take possession of and sell and dispose of the goods, &c. of *C. B. & Co.* to a very large amount, and in fact of nearly the whole thereof, for the purpose of paying the said balance so due as aforesaid ; and that about that time the said *F. U.* actually delivered to the said *T. R.* goods, &c. to the value, as per invoice, of $7,959.97 ; that the greater part of the said goods so delivered by the said *F. U.* to the said *T. R.* were not in fact included in the said bill of sale ; that the said *F. U.* also delivered to the said *T. R.* divers promissory notes, of persons names unknown, and that on the 17th September, 1840, the said *F. U.*, and on the 6th October, 1840, the said *C. B.*, applied for relief under the insolvent laws of *Maryland*, and that on the 8th of January, 1841, the complainant was appointed trustee for the benefit of their creditors, and gave approved bond, with security, as such; that complainant being advised that the payment of the said sum of $3,240, by *B. & U.* to *A. & R.*, and the execution of the said bill of sale

and delivery of goods, &c., was illegal, fraudulent and void, after his appointment as aforesaid, made application to the said *T. R.* to pay to him, as trustee as aforesaid, the said sum, &c., and deliver up, &c., in order that he might make distribution among the creditors of the said *B. & U.*, but that the said *T. R.*, contriving and intending how further to injure and defraud the complainant and the creditors of the said *B. & U.*, pretends that the said sum of $3,240 was rightly paid by *B. & U.*, and that the bill of sale, &c. rightly made and delivered to *A. & R.*, and refuses to pay, &c. Prayer for subpœna; answer to bill and various specific interrogatories; for an account; that the bill of sale may be declared fraudulent and void; that *A. & R.* may be decreed to pay and deliver up the money, property and effects in their hands of the said insolvents; that their claim as creditors may be forfeited for their collusion with the said *B. & U.* to obtain an undue preference, &c.

The answer of *Albers & Runge* alleged that prior to the 7th August, 1837, *C. B.* was a partner of the firm of *Rhodes, Eicke & Co.*, which carried on business in *Baltimore*, till that day, when it was dissolved, and *B.* then commenced and carried on business on his own account in said city. The business in which the said *B.* was almost exclusively engaged was selling by retail silk piece goods, of which the defendants were importers; that *B.* applied to the said *A.* to send to *Europe* large orders for silk piece goods, to be imported by him, and to be settled for on their arrival, either by the payment of their cost in cash or in some other satisfactory way, an engagement frequently made by those in the retail trade with importing merchants who enjoy a credit abroad; that *B.* also applied to *A.* to sell him goods on credit, and to lend him money when he stood in need of it, all of which said *A.* was perfectly willing to do for the assistance and accommodation of the said *B.*, if he could be made safe in so doing, and it was accordingly agreed between them that the said *A.* would accommodate the said *B.* in the way he wished, provided said *B.* would secure him by executing a mortgage or bill of sale on his stock of

goods, outstanding debts, furniture, &c., and with the under-standing that the sum of money to be advanced, including goods sold to *Brecht*, was at no time to exceed the sum of $10,000; and in the month of August, 1837, the said *B. & A.* applied to a magistrate to prepare a bill of sale. In conform-ity with the above agreement said bill of sale was drawn up, and executed on the 16th August, 1837, and recorded; and said bill of sale appears on its face to have been made for the consideration of $10,000, paid by said *A.* to *B.*, but there was at the time when it bears date only the sum of $716$\frac{56}{100}$ ac-tually due from *B.* to *A.*; said *Albers* had, however, at that time sent out orders for goods for account of *B.* to the amount of $3,563, which arrived early in the month of October follow-ing, and were then delivered to said *B.* without further secu-rity than said bill of sale. It was the intention of said bill of sale, and was expressly so agreed upon between the parties thereto, that it should stand as a security for the sum then due, as well as for all subsequent debts which might become due from said *B.* to said *A.* to an amount not exceeding $10,000 at any one time. From that time said *A.*, relying upon the security afforded by said bill of sale, gave extensive credits to said *B.*, both by selling him goods and loaning him money; that on the 1st January, 1838, said *A.* took *T. R.*, who had been his clerk since 1st January, 1836, into partnership with him, and soon after said *A.* sailed for *Europe*, where he has ever since remained; that early in the year 1839, *B.* proposed to take *U.* into partnership with him, who was his clerk and bookkeeper, provided he *U.* would put into the concern a capital of $3,000; said *U.* assented and succeeded in obtaining said amount, as these defendants have been informed and believe, from his father, who deposited four thousand Rex dollars to the credit of said *U.* with a house in *Breman;* at the request of said U. these defendants drew a bill for that amount, at the then current rate of exchange, making $3,240, which by or-der of said *U.* they passed to the credit of said *B.* on the 30th July, 1839, and on the 1st September, 1839, said *U.* in pur-suance of the above agreement, entered into a copartnership

with said *B.*, under the firm of *C. B. & Co.*; at this time *B.* had a valuable stock of goods, which passed to the new firm; and defendants admit that the debts due to as well as by said *B.* also passed to said new firm, which became entitled to receive the former as well as bound to pay the latter; that after the establishment of *C. B. & Co.* this defendant, *T. R.*, thinking that the bill of sale above mentioned might not avail to secure the debts due by *C. B. & Co.* to *Albers & Co.*, *applied to said C. B. & Co.*, and requested them to execute a new bill of sale, which they did on the 2nd December, 1839; that said bill of sale, like the former, states on its face that it was made for the consideration of $10,000, but at the time of its date there was due from *C. B. & Co.* to *Albers & Co.*, the sum of $6,418.73, and *Albers & Co.* had become responsible for *C. B. & Co.*, by endorsing their paper to the amount of $2,264 more, making in all $8,682.73, at the date of said bill of sale; and it was the intention of said bill of sale, and was so expressly understood between the parties thereto, that it should stand as a security, both for the sum then due and for the notes on which said *A. & Co.* had become liable as endorsers as aforesaid, as well as for all subsequent debts which might become due from said *B. & Co.* to said *A. & Co.*, to an amount not exceeding $10,000, at any one time, and these defendants wholly deny that the object of either of said bills of sale was to give to said *A.*, or the said *A. & Co.*, an undue, illegal and improper preference, or to hinder, delay and defraud the rest of the creditors of the said *B.* or *B. & Co.*; that the object of both bills of sale was to give *A.* and *A. & Co.* a legal security for the important assistance which they rendered, first to *B.*, and afterwards to *B. & Co.*, and that the intention of the second bill of sale was merely to carry out, in good faith, the agreement originally entered into, and that there was no other consideration for said bill of sale than that stated. The answers then denied that the execution of the bills of sale, or the debts due to them, or the knowledge they had of the condition of the firm of *C. B. & Co.* were in any way kept secret by them from the rest of the creditors; that said bills of sale

were duly recorded, which was notice to all the world; and that defendants had no knowledge or suspicion that said *B.* was insolvent. The answer then proceeded to set forth a variety of transactions between said partners, and first heard of insolvency of the firm of *B. & Co.*, in February 1840, when sued, examined their books and so found it; that on the 21st August 1840, said *R.* demanded of *U.* (his partner *B.* being then absent,) delivery of the goods conveyed by said bills of sale for the payment of their debts, said *U.* accordingly delivered up to him the said goods. The answers also denied that the greater part of the goods as aforesaid, delivered to the defendants, was not included in said bill of sale, on the contrary, that all of said goods were in the possession of *B. & Co.*, at the time of the execution of said last mentioned bill of sale, and were included within it, except a few pieces, amounting to about $270 in value.

The defendants then set forth in extenso the accounts between the parties, with a great variety of details and exhibits, and denied all manner of fraud or collusion.

A commission was then issued, under which was proved:

The bill of sale of 2nd December 1839, from *C. B. & F. U.*, for and in consideration of the sum of $10,000, in hand paid by *A. A. & T. R.*, granted, bargained and sold to *A. A. & Co.*, &c., "all the goods, merchandize and furniture, now remaining, standing and being in the store No. 95, in *Baltimore* St., and now in the occupation of us the subscribers, trading under the firm of *C. B. & Co.*, that is to say, 250 pieces of silk goods, &c., as also all the outstanding debts, promissory notes and other evidences of debt, belonging to us, or any one of us, and all future proceeds and avails arising from sales of the goods of said store;" and provided, that in case I the said *C. B. & Co.*, their, &c., shall well and truly pay to the said *A. & Co.* the said sum of $10,000, with interest for the same, on or before the 2nd March 1840. Recorded on the 4th Dec. 1839. The bill of sale of the 16th August 1837, from *C. B.* to *Anthony Albers*, was similar to that above, and was recorded on the day of its date.

Under the commission, the proceedings of *C. B. & F. U.*, as insolvent debtors, were also proved, with a great variety of accounts, notes, letters, schedules of goods, accounts of sales, and accounts current, were also proved to show the condition of the house of *C. B. & Co.*, before, and at the time of failure, and the claims of the defendants as their creditors.

The complainant, in offering the proceedings of the two insolvents, *C. B & F. U.*, before the commissioners of insolvent debtors, limited his offer.

1. To show that they had made such application, and the time of making it.

2. To his due appointment and bonding as trustee.

3. To affect the credit due to the said insolvents, who were both sworn as witnesses for the defendant, and who vary in their statements as such witnesses, so far as their answers to interrogatories before the said commissioners may affect them.

The defendant excepted to the admissibility of the said proceedings, as evidence for any other purpose than that stated in the complainant's offer.

The Chancellor, (BLAND,) on the 20th of January 1842, dismissed the bill with costs, being of opinion, that at the time of the execution of the deed of 2nd December 1839, by the debtors *B. & U.* to their creditors *A. & R.*, that they had notice of the condition of insolvency of their said debtors, if they were then in fact in such a condition.

From this decree the complainant appealed.

The act of 1825, ch. 50, declared that no mortgage or deed of that nature shall operate, either in law or equity, as a lien or charge on any estate or property whatsoever, for any other or principal sum or sums of money, than the principal sum or sums that shall appear on the face of such mortgage, and be specified and recited therein, and particularly mentioned and expressed, to be secured thereby, at the time of executing the same.

The act of 1834, ch. 293, entitled, "A further supplement to the act, entitled, an act relating to insolvent debtors in the

city and county of *Baltimore*, sec. 1, enacted, that in all cases of applications hereafter to be made for the benefit of insolvent debtors, under the act to which this is a supplement, or any supplement thereto, all conveyances, assignments, sales, deliveries, payments, conversions, or dispositions of property or estate, real, personal or mixed, debts, rights or claims, or confessions of judgment that shall be made, or caused or allowed to be made, whether upon request or otherwise, by any applicant to, or in favor, or with a view to the advantage or security of, and with intent to prefer any creditor or creditors, security or securities of such applicant, when such applicant shall have had no reasonable expectation of being exempted from liability or execution, for or on account of his debts, without applying for the benefit of the insolvent laws as aforesaid, shall be deemed within the meaning and effect of the sixth section of the act to which this is a supplement, to have been made with a view, or under an expectation on part of the applicant, of being or becoming an insolvent debtor, and with an intent thereby to give an undue and improper preference; *provided*, however, that the provisions of this section shall not apply as against any person or persons claiming, by virtue of any assignment or conveyance, for valuable consideration, from or under the creditor or creditors, security or securities, their heirs, executors or administrators, nor to any case where the said creditor or security shall appear not to have had notice of the consideration of insolvency as aforesaid of said debtor.

The cause was argued before ARCHER, DORSEY and CHAMBERS, J.

By COLE and REVERDY JOHNSON for the appellant, and By BRUNE and McMAHON for the appellees.

ARCHER, J., delivered the opinion of this court.

The bill in the present case has been filed to vacate a deed of mortgage given by *Brecht* and *Uhthoff* to *Albers* and *Runge*, on the 2nd day of December, 1839, to obtain an account and payment for the goods and promissory notes delivered over to

*Albers* and *Runge* in pursuance of said deed, and for the payment over to the complainants of the sum of three thousand two hundred and forty dollars, with interest, which was applied by *Uhthoff* (in contemplation of a partnership to be entered into by him with *Brecht*) to the payment of a debt due by *Brecht* to *Albers & Co.*

The deed in controversy is alleged to be void as in violation of the insolvent laws, to be condemned at common law, and inoperative under the act of Assembly of 1825, ch. 50, entitled "An act to limit the operation and effect of mortgages."

There can be no pretence for considering the deed void by the insolvent laws existing anterior to the law of 1834, ch. 293, because, in our view, the evidence, taken in connexion with the answers, it is, by no means, satisfactory that the mortgagors, at the time of executing the deed, contemplated taking the benefit of the insolvent laws. The deed could not, therefore, be condemned as made with a view, or under an expectation, of being or becoming insolvent debtors, and with intent thereby of giving an undue and improper preference. Nor could it be set aside, within the meaning of those laws, since the decision of this court in the case of *Crawford & Selman* vs. *Taylor*, being made at the request of the mortgagees.

It is, however, contended that the deed is void as being made in contravention of the act of 1834, ch. 293, which, so far as regards the present question, appears to be a local law, confined to the city and county of *Baltimore*. This law provides that although the transfer shall be made upon request, yet if the bargainor, at the time of conveyance, had no reasonable ground for believing that he would be exempt from execution or liability for his debts, without applying for the benefit of the insolvent laws, such conveyance should be considered as made with a view or under an expectation of being or becoming an insolvent debtor, and with intent thereby to give an undue and improper preference, provided the creditor obtaining the conveyance should appear not to have had notice of the condition of insolvency of such debtor.

Without stopping to enquire whether the debtors in this case had any reasonable expectation of exemption from lia-

bility or execution, on account of their debts, otherwise than by taking the benefit of the insolvent laws, it will be sufficient for us to say that we are satisfied that the mortgagees had not notice of the insolvent condition of the mortgagors.   Our be-lief on this subject is derived from the fact that money was loaned and goods sold after the date of the deed, and that notes were taken for the payment of their debts to the creditors, *Al-bers & Runge*, in semi-monthly instalments ; all which circum-stances would not be likely to have occurred if the mortgagors had been considered as insolvent, or in such a condition that they had no reasonable expectation of being exempt from lia-bility or execution for their debts, except by taking the benefit of the insolvent laws.   No inferences can be drawn, prejudi-cial to the mortgagees, from the examination of the books of the mortgagors, by one of the mortgagees, because, as far as the character of that examination is disclosed by the testimony we cannot perceive that it was calculated to impart informa-tion in relation to the condition of the firm either as to solvency or insolvency.   We have no evidence that enquiries had been made into the extent of the assets of the mortgagors, or the extent of their liabilities, by enquiry into which alone could any judgment have been formed, or any notice be attributed. And here we must be permitted to remark, that according to our construction of the act under consideration, the notice which is to vitiate a conveyance is not a technical or construc-tive notice, but an actual notice, derived from a knowledge of the condition of the mortgagors.

The next subject submitted for enquiry is the validity of this deed at common law.   Its invalidity on the mere ground of pre-ference, cannot, upon legal principles, be urged, for a debtor has a right to prefer one creditor to another by the common law, and independent of our statutes, in relation to insolvent debtors.

The consideration proved, if the proof be admissible, es-tablishes clearly a good and valid consideration to support the deed.   The evidence *dehors* the deed is that the deed of mortgage was made to secure advances made, and to be

made, to the extent of $10,000. The consideration stated in the deed is $10,000, in hand paid; and it is averred the deed is taken as a mortgage to secure that sum. The only question, in this branch of the case, is whether this evidence is admissible. Evidence cannot be admitted which would have the effect of changing the character and legal operation of the deed, as in the case of *Hern & Soper,* where a deed purports to be made on a monied consideration it cannot be shown that money did not constitute the consideration, because this would have the effect to change the character of the deed; and in *Betts and the Union Bank,* it was decided that where a deed is impeached for fraud, and the consideration stated is money, it will not be allowable to set up a different consideration, as marriage, to support the deed. In such a case the effect of the evidence, if admitted, would have been to change the deed from a deed of bargain and sale to a covenant, to stand seized to the use of the grantee.

In the case now before us the admissibility of the evidence would produce no such result. The bill admits, and it is fully proved, that a monied consideration existed for the deed. Advances had been made to the mortgagors, though not to the extent mentioned in the deed; so that the instrument would, in contemplation of law, be a deed of bargain and sale, standing on the consideration proved in the same way as it would be if standing on the consideration expressed in the deed. In the case of *Betts and the Union Bank,* the evidence could not be received, because by the disproof of the consideration expressed, the deed had been rendered inoperative and void, and parol evidence of a different consideration could not be received to set up the deed thus impeached. But here the deed is not impeached or rendered inoperative and void, by the evidence offered, but the evidence is adduced to rebut any idea of fraud, by showing, not a different consideration, but the same kind of consideration, differing only in amount, and the circumstances under which it assumed this shape. And this, it will be perceived, was the view of the case of *Betts and the Union Bank,* taken by this court, in 9 *Gill & John.* 91, and 10 *G. & J.* 248

The design of the law-makers in the passage of the act of 1825, ch. 50, was to prevent liens on property, to the prejudice of creditors, for amounts and claims never contemplated by the parties at the time of its execution, and of which the deed, by its terms, gave no notice: as if a deed were executed to cover a mortgagee against all future liabilities of any and every description, which the mortgagor might incur or be responsible for, to the mortgagee. Under such a deed, what would have prevented the mortgagee from purchasing up claims at a depreciation against the mortgagor, to indefinite amounts, and thereby acquiring priority, to the prejudice of creditors. A practice prevailed anterior to the act of 1825, ch. 50, of taking mortgages for specified sums of money, greatly below the value of the mortgaged premises, with a clause or clauses providing that the mortgaged premises should be held as a security for all future liabilities or advances by the mortgagee to the mortgagor, by which means the creditors of the mortgagor were defrauded, sometimes by fraudulent combinations between the mortgagor and mortgagee, or by the acts of the mortgagee alone, who, after the known insolvency of the mortgagor, purchased up liabilities of the mortgagor at depreciated rates, and held them as liens on the mortgaged premises for their nominal amounts; thus excluding a portion of the creditors from an equal dividend of the mortgagor's estate. Creditors becoming such after the date of such mortgage, were deluded and suffered loss, which no precaution could guard them against. Such transactions the law was designed to meet; but not a case like this, where the amount is stated; where the world is apprised of its limits, and where the parties design to cover all advances which may be made, to the extent of the sum limited in the mortgage. In the mortgage now under consideration, no one could be deceived or prejudiced.

The views which we have above taken, disposes of the various questions raised in the case, and concurring with the Chancellor in his judgment, we affirm his decree.

DECREE AFFIRMED.