FRANK M. EWING CO., INC. *v.* KRAFFT
COMPANY ET AL.

[No. 150, September Term, 1959.]

22

*Decided March 15, 1960.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Carlyle J. Lancaster* and *T. Hammond Welsh, Jr.,* with whom were *Welsh, Dyer & Lancaster* and *Betts, Clogg & Murdock* on the brief, for Frank M. Ewing Co., Inc., the appellant.

*John C. Keating* for Krafft Company, one of the appellees.

*E. Austin Carlin* for James G. Hollis, another appellee.

Submitted on brief by *J. Willard Nalls, Jr.,* for Rose Hill Estates, Inc., an appellee, and by *H. Ralph Miller* for John G. Salsman, an appellee and the cross-appellant.

HAMMOND, J., delivered the opinion of the Court.

On the morning of the day of sale under foreclosure of a construction deed of trust, appellant Frank M. Ewing Co., Inc., the assignee of the note secured by the deed, handed Charles Galeano, president of Custom Line Homes, Inc., the builder and maker of the note, a check for $8,300.00 purporting to be the final advance under the deed, and was immediately given back the endorsed check to be applied in reduction of the builder's large debt to the Ewing Company. The court auditor, in an amended account, disallowed the $8,300.00 claim of the Ewing Company against the proceeds of sale, as previously directed by the Chancellor who overruled exceptions to the amended account, thereby occasioning this appeal.

In August, 1955, Custom Line Homes, Inc., was granted by the B. F. Saul Company of Washington a construction loan of $36,500.00 on two lots in Montgomery County. On August 30, a note for $36,500.00 payable to Everett B. Bean, a nominee of the Saul Company, was executed, as was the deed of trust securing it. Simultaneously, a completion bond was given by Custom Line Homes, Inc., and by Galeano and his wife, with Frank M. Ewing, president and majority owner of the Ewing Company, dealers in building supplies, as surety for the "exclusive protection of the lender" against mechanics' liens and loss by reason of noncompletion of the houses to be built. No money was paid on August 30. An oral understanding as to disbursements had been reached and was embodied by Saul in a schedule, it being contemplated that so

much would be paid when first and second floor joists, respectively, were up, so much when house was "fully roofed and weatherboarded," so much when ready for plaster, and so on. The final payment of $4,150.00 on each house was scheduled when the houses were finished and liens released.

During the course of the construction of the houses the Saul Company made disbursements from time to time, as had been contemplated. The final disbursements of $4,150.00 on each house were not made because the houses were never finished by Custom Line Homes, Inc., and there had been no release of liens. (The purchaser at foreclosure of one of the houses spent over $5,000.00 to finish it and make it saleable.) Galeano ran into financial difficulty with the houses here involved and others he was building individually and in the name of another corporation. The Ewing Company furnished materials on credit to Custom Line Homes, Inc., Galeano personally, and to his other corporation, much of them with knowledge of his insolvency and the existence of outstanding junior mortgage liens and mechanics' liens. At about $33,000.00, some $12,000.00 of which was for materials furnished Custom Line Homes, Inc.

Early in 1958 the Ewing Company attempted to buy up for twenty-five cents on the dollar the claims of the various the time of the foreclosure, Galeano owed the Ewing Company creditors of Custom Line Homes, Inc., who had taken second and third deeds of trust or secured mechanics' liens or judgments covering the lots and houses here involved. This effort proved unsuccessful. In March, 1958, Mr. Ewing wrote Saul a letter requesting foreclosure under the deed of trust (the note was in default) and agreeing to bid at the sale the amount due on the note. Saul instituted proceedings and the sale was advertised for April 15, 1958.

On the morning of April 15, the Ewing Company paid Saul the exact amount it had advanced on the note of August 30, 1955, plus interest—a principal amount of $28,200.00 to which was added interest of $1,590.18, or a total of $29,790.18—and took an assignment of the note. Thereafter on the same morning, the Ewing Company issued its check for $8,300.00 to Custom Line Homes, Inc., in re-

liance upon the prior agreement of Galeano to immediately endorse and return the check. This was done and the check deposited in the account of the Ewing Company in the bank on which it was drawn. The testimony leaves no doubt that if it had not been sure that Galeano would return the check it would not have been issued. Custom Line Homes, Inc., was given credit for $8,300.00 on the amount it owed the Ewing Company. Mr. Ewing testified frankly that he thought his company, as holder of the note, had a right to make the $8,300.00 advance to the borrower to bring the amount borrowed to $36,500.00, the face amount of the note, and that his purpose was to bring about a partial payment on the large sum due him by Galeano, even though this would be at the expense of the other creditors.

The two properties were sold for $45,000.00, although neither was finished. In a first account the auditor allowed the Ewing Company the amount it had paid Saul and the $8,300.00, as well as accrued interest. The appellees excepted and Judge Pugh, after hearing, disallowed the $8,300.00 payment and ordered a new account. The Ewing Company excepted to the disallowance of its $8,300.00 claim in the amended account and appealed from its ratification.

In his opinion Judge Pugh said "to sanction such a transaction would be a travesty on justice * * *. It would be unconscionable for a Court of Equity to close its eyes to such a maneuver." The Ewing Company regards this language as a declaration it was guilty of actual or constructive fraud. We see no basis for such an inference if one was intended. Except for the equality compelled by the bankruptcy and insolvency statutes, and absent fraud, a debtor has the legal right to prefer a creditor, and the creditor is subject to no just criticism legally if he obtained a preference. *Kline v. Inland Rubber Corp.,* 194 Md. 122, 137; *Drury v. State Capital Bank,* 163 Md. 84, 89-90; *Wareheim v. Bayliss,* 149 Md. 103, 107.

The matter before us turns simply on whether the law gives the Ewing Company the benefit of the senior lien of the deed of trust as to the $8,300.00 it advanced with actual and complete knowledge of other outstanding liens which had attached after that of the deed of trust.

In answering the question we assume, without deciding, that the handling of the $8,300.00 check to Galeano, its immediate endorsement and redelivery, and the deposit of the check in the drawer's account in the drawee bank was not in effect the paper transaction it was literally—that is, we assume there was an effective advance of $8,300.00 and a payment on account of Galeano's debt to the Ewing Company. On this assumption we find that the lien of the deed of trust does not encompass the $8,300.00 payment made by the Ewing Company.

Mortgages, and deeds of trust in the nature of mortgages,[1] to secure future advances "if *bona fide* made, have always been sanctioned by the common law, and if unexceptionable in other respects, their validity cannot be questioned in Maryland." *Wilson v. Russell,* 13 Md. 494, 530. 1 Jones, *Mortgages,* Sec. 448 (8th Ed.). In *Wilson* this Court held in 1859 that the lien of such a mortgage or deed of trust covers, in preference to a claim under a junior intervening lien, an advance as to which the lender had no option and was obligated under the instrument to make, even though the advance was made with knowledge of the intervening encumbrance. In reaching its result, the opinion relied on the English case of *Gordon v. Graham,* 7 Vin. Abr. 52, pl. 3, 2 Eq. Cases Abr. 598, 22 Eng. Rep. 502 (Ch. 1716),[2] which in 1861 was overruled by the House of Lords in the decision in *Hopkinson v. Rolt,* 9 H. L. C. 514, 11 Eng. Rep. 829.[3]

---

1. A deed of trust in the nature of a mortgage is not by the express terms of Code (1957), Art. 66, sec. 2, subject to the specificity required by that statute for mortgages for future advances as to the time and amount of an advance. *Eisinger Mill & Lumber Co. v. Dillon,* 159 Md. 185; compare *Dudley v. Roberts,* 144 Md. 155 (bill of sale, treated as constructive deed of trust, not to be regarded as a chattel mortgage to which the statute applied); and *Robinson v. Consolidated Real Estate & Fire Ins. Co.,* 55 Md. 105 (judgment to secure future advances not within the statute).

2. Cowper, Lord Chancellor, held that "[t]he second mortgagee shall not redeem the first mortgage without paying all that is due, as well the money lent after, as that lent before the second mortgage was made; for it was the folly of the second mortgagee, with notice, to take such security."

3. The question for decision was succinctly stated by Lord

In 1880 the overruling of *Gordon v. Graham* was called to the attention of this Court in *Robinson v. Consolidated Real Estate & Fire Ins. Co.*, 55 Md. 105, 108, but the Court said, referring to *Wilson v. Russell*: "The decision in 13 Md. does not rest, and was not placed solely on *Gordon v. Graham;* for this court * * * said that 'the weight of authority sustained the principle established in *Gordon v. Graham.*'"

There has been no modification in Maryland of the rule adopted in *Wilson v. Russell* as far as advances which the lender was obliged to make are concerned. Whether the same result follows where the lender with actual knowledge of the intervening liens voluntarily makes an advance he could not have been compelled to make, seems not, before this case, to have been directly presented for decision in this State. Whatever may be their answer to other phases of the subject, almost all jurisdictions agree in holding that under such conditions the claim of the lender is inferior to the lien of the intervening encumbrances. Watkins, *Maryland Mortgages for Future Advances,* 4 Md. L. Rev. 111, 119, note 23, says, referring to the great weight of general authority and to the mortgagee: "If the future advances are optional, and not obligatory, he is postponed to intervening liens of which he had actual, not merely constructive notice." See also 1 Jones, *Mortgages,* Secs. 452-454, 456 (8th Ed.); 5 Tiffany, *Real Property,* Secs. 1463-1464 (3rd Ed.); 4 Pomeroy, *Equity,* Sec. 1199a (5th Ed.); 59 C.J.S. *Mortgages,* Sec. 230 a(2); Annotation: 81 A.L.R. 631; *Housing Mortgage Corp. v. Allied Constr., Inc.* (Pa.), 97 A. 2d 802; *Community Lumber Co. v. California Pub. Co.* (Cal.), 10 P. 2d 60; *New York & Suburban Federal Savings & Loan Ass'n v. Fi-Pen*

---

Chelmsford thus: "A prior mortgage for present and future advances; a subsequent mortgage of the same description; each mortgagee has notice of the other's deeds; advances are made by the prior mortgagee after the date of the subsequent mortgage, and with full knowledge of it; is the prior mortgagee entitled to priority for these advances over the antecedent advance made by the subsequent mortgagee?" The question which had been answered in the affirmative by *Gordon v. Graham* was answered in the negative by *Hopkinson v. Rolt* in overruling *Gordon v. Graham.*

*Realty Co.,* 133 N. Y. S. 2d 33; *Axel Newman Heating & Plumbing Co. v. Sauers* (Minn.), 47 N. W. 2d 769, 772; *Goss v. Iverson* (Idaho), 238 P. 2d 1151; *Elmendorf-Anthony Co. v. Dunn* (Wash.), 116 P. 2d 253; *Doran v. Britto* (R. I.), 161 A. 141; *Lumber & Builders' Supply Co. v. Ritz* (Dist. Ct. App., 4th Dist., Cal.), 25 P. 2d 1002; *North v. J. W. McClintock, Inc.* (Miss.), 44 So. 2d 412.[4]

The record makes it plain that the Ewing Company made a voluntary advance and its actual knowledge of the intervening liens is conceded. The note and the deed of trust do not of themselves reveal all the rights and obligations of the parties

---

4. In *Hopkinson v. Rolt,* 9 H. L. C. 514, 534-535, 11 Eng. Rep. 829, 838, which has been referred to in the opinion, Lord Chancellor Campbell explained the reason for overruling *Gordon v. Graham* and he made the case for refusing a prior lien to a lender who had made an advance with actual knowledge of intervening liens in these words: "How is the first mortgagee injured by the second mortgage being executed, although the first mortgagee having notice of the mortgage, the second mortgagee should be preferred to him as to subsequent advances? The first mortgagee is secure as to past advances, and he is not under any obligation to make any farther advances. He has only to hold his hand when asked for a farther loan. Knowing the extent of the second mortgage, he may calculate that the hereditaments mortgaged are an ample security to the mortgagees; and if he doubts this, he closes his account with the mortgagor, and looks out for a better security. The benefit of the first mortgage is only lessened by the amount of any interest which the mortgagor afterwards conveys to another, consistent with the rights of the first mortgagee. Thus far the mortgagor is entitled to do what he pleases with his own. The consequence certainly is, that after executing such a mortgage as we are considering, the mortgagor, by executing another such mortgage, and giving notice of it to the first mortgagee, may at any time give a preference to the second mortgagee as to subsequent advances, and, as to such advances, reduce the first mortgagee to the rank of *puisne* incumbrancer. But the first mortgagee will have no reason to complain, knowing that this is his true position, if he chooses voluntarily to make farther advances to the mortgagor. The second mortgagee cannot be charged with any fraud upon the first mortgagee in making the advances, with notice of the first mortgage; for, by the hypothesis, each has notice of the security of the other, and the first mortgagee is left in full possession of his option to make or to refuse farther advances as he may deem it prudent."

as to the times and amounts of the advances. Without objection parol evidence was admitted to show the details of the transaction and the understanding of the parties.[5]

Mr. Thompson, one of the trustees under the deed and vice-president of the Saul Company, repeated several times that the making of the advances was at the sole discretion of Saul, saying that whether to make an advance or not was "entirely the decision of the company", which must be accepted by the borrower. Mr. Ewing admitted that he knew Saul had refused to make the final disbursement. He testified that his understanding was that Saul had a right to make that disbursement if it desired but could not have been compelled to do so and that he, as Saul's assignee, made the advance of $8,300.00 because he thought he had the right to do it if he wished. At the time the $8,300.00 was advanced, the note and deed of trust were in default. Even under the schedule of contemplated advances Saul was not to make the final disbursement until the houses were finished and liens released. Those conditions never were met. The final payment, we find, was voluntary. The Supreme Court of Pennsylvania made a similar finding on comparable facts in *Housing Mortgage Corp. v. Allied Constr., Inc.* (Pa.), 97 A. 2d 802, cited earlier.

In the *Wilson v. Russell* case, Wilson had agreed to lend William Mason & Son on the security of the deed of trust "promissory notes, from time to time, as may be desired by said firm" to an amount not exceeding $36,000.00 at any one time during three years from the date of the first loan, and $18,000.00 during the fourth year. The notes were to mature in six months and were "to be regularly taken up and retired at maturity" before new notes were issued. We see the agree-

---

5. Parol evidence is admissible to show the intent and details of a mortgage for future advances. 1 Jones, *Mortgages,* Sec. 451a (8th Ed.): "To show the actual amounts loaned, and to fix the duration of the transaction, by showing the time when the first loan was actually made, extrinsic proof may be offered; such proof does not contradict the deed, or alter, in any respect, its legal operation and effect." *Wilson v. Russell* at page 533 of 13 Md.; see also *Cole v. Runge,* 1 Gill 412.

ment of Wilson as obligatory [6] and, although there was no discussion in the opinion as to whether the rule of *Gordon v. Graham* applies where the making of the advance is optional with rather than obligatory upon the lender, we read the case as deciding no more than that the rule applies where the undertaking is obligatory.

We have found no Maryland case where advances were voluntarily made after actual notice of intervening liens. The Court in *Robinson v. Consolidated Real Estate & Fire Ins. Co.,* 55 Md. 105, 109, cited above (which followed *Wilson*) said: "The rule adopted by this Court in *Wilson v. Russell, supra,* is not so inflexible that it can have no exception. The peculiar circumstances of some cases might present us occasion to depart from that rule, for the purpose of doing absolute equity between the parties." We do not regard *Wilson v. Russell* as precluding a holding that a voluntary advance after actual notice of the attaching of intervening liens ranks behind those liens, and feel constrained to justify the *Robinson* prophecy and follow the decisions elsewhere that have reached that conclusion.

The Chancellor directed the auditor to allow the Ewing Company interest on the $28,200.00, principal amount it had paid the Saul Company for the note from September 1, 1958, when the account would have been ratified except for the effort of the Ewing Company to establish its priority for the $8,300.00 advance until September 22, 1959, when the audit finally was ratified. Appellant conceded at the argument that this allowance was erroneous. The order appealed from will be affirmed except as to the allowance of the interest item which will be stricken.

> *Order affirmed in part and reversed in part, costs to be paid by appellant.*

---

6. Judge Watkins in his article on *Maryland Mortgages for Future Advances,* 4 Md. L. Rev. 111, 119, referred to above, makes a thorough analysis of *Wilson v. Russell,* and concludes: "The undertaking here could fairly be construed as obligatory—Wilson agreed to lend his notes 'from time to time, as may be desired by said firm of Mason & Son' up to a stated maximum at any time."