CORNELL, ET AL. *v.* DUER, ET AL.

[No. 307, September Term, 1969.]

*Decided April 2, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*David MacDonald* for appellants.

*John C. Joyce,* with whom were *Duckett, Orem, Christie & Beckett* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

Mr. and Mrs. George L. Cornell (the Cornells), having been victimized by a Montgomery County real estate promoter, who was in no way associated with the appellees, were denied the relief they sought in the Circuit Court for Montgomery County, and now turn to this Court for help.

It all started in January of 1965 when the Cornells sold the property which they owned at 4715 Miller Avenue in Bethesda, Maryland to 4718 Bethesda Avenue,

Inc., (Zipkin), a creature of one Norman N. Zipkin, for about $290,000, and took back a purchase money deed of trust securing a promissory note for $55,000, on which only interest at 6% would be payable for five years, after which the principal amount would be due.

The deed of trust contained a provision, not uncommon in transactions of this sort:

> "It is understood and agreed that the holder of the note secured by this Deed of Trust will authorize the within named trustees to subordinate this Deed of Trust to a bona-fide construction loan made by a reputable lending institution, provided that this Deed of Trust is not thereby reduced to less than a second deed of trust of record."

For two years, nothing much happened. The Cornells received the interest called for by the note until 29 January 1967. In April of 1967, Zipkin negotiated a construction loan for $3,525,000 with Long Island Savings Bank (Long Island). After the closing, Long Island's title company requested that the Cornells subordinate their deed of trust to the construction loan.

With commendable diligence, the Cornells' counsel asked for a copy of the deed of trust to Long Island, which was sent to him by the title company. He then wrote a letter to Long Island:

> "I represent Mr. and Mrs. George L. Cornell who hold a purchase money deed of trust on property in Bethesda, Maryland, which they sold to 4718 Bethesda Avenue, Inc. one or two years ago. This same property is the subject of the deed of trust dated April 24, 1967, made by 4718 Bethesda Avenue, Inc. to secure a loan of $3,525,000 by your Bank.
>
> "My clients have been asked to subordinate to your deed of trust and I am seeking information so that I can make a recommendation. Will you please send me a copy of the promissory note

and the 'Loan Agreement'? Also, please state whether plans for the construction of the proposed building have been submitted to you, whether you have examined the same, what type of structure is to be erected, what is the estimated cost of the building and who made such estimate. Also, if the loan agreement does not indicate, please state the schedule upon which the loan moneys will be paid to the borrower, and what precautions you will take to see that this schedule is adhered to. Also, please describe what completion and/or lien bonds the borrower will be required to post.

"Your cooperation in this matter will be sincerely appreciated."

About 10 days later, Long Island's counsel replied:

"Your letter of May 22nd, 1967 directed to our client, The Long Island Savings Bank, has been forwarded to this office.

"Enclosed please find copies of the documents you requested.

"The construction plans which have been examined by our client, call for the erection of a 15 story concrete and brick apartment building containing 260 apartments and basement garages for 171 cars. The estimated costs of the building is $4,740,000.00 and said estimate was made by William M. Throckmorton, M.A.I., of Washington, D.C.

"On site inspections will be made by an architect who will certify that the necessary work has been done before payments are made by our client.

"No completion bond is required. If there are any questions please do not hesitate to contact the undersigned."

In August 1967, the Cornells subordinated their deed

of trust to the construction loan upon the understanding, effected by an assignment from Zipkin (which was assented to by Long Island), that the obligation which the Cornells held would be satisfied, with interest, from the *last* proceeds to be withdrawn under the construction loan agreement.

What neither the Cornells nor their counsel knew was that contemporaneously with the closing of the loan from Long Island, Zipkin had borrowed $200,000 [1] from Trade Bank and Trust Company of New York (Trade Bank) and had assigned, with the consent of Long Island, $75,000 and interest from the second and third payments and $50,000 and interest from the fourth payment to be withdrawn under the Long Island construction loan agreement, as security for the repayment of the loan made by Trade Bank. Ten days after the loan was made Trade Bank filed a financing statement with the Clerk of the Circuit Court for Montgomery County, and later joined with Long Island in assenting to the assignment which Zipkin gave the Cornells.

The check for the $200,000 loan was drawn to Zipkin's individual order on instructions from Zipkin as president of the borrower. Zipkin deposited the check in the account of The Wheeler Corporation (another Zipkin enterprise, which was the general contractor on the Bethesda job) with Suburban Trust Company, in Hyattsville, and within a month or so, the entire sum had been dissipated, about half of it being used, according to the Cornells, for purposes unrelated to the Bethesda project.

By December, 1967, after it had disbursed more than $700,000 in construction loan funds, Long Island had received notices from three subcontractors of their intention to assert lien claims against the project, and ultimately Long Island gave Zipkin notice of its intention to terminate further advances. Even after this action, however, Long Island disbursed $50,000 in January,

---

1. Zipkin had originally sought a loan of $250,000 and the record suggests that the Cornells' loan might have been repaid, had the borrowing been in the larger amount.

1968, of which $10,532.16 went to Long Island, for interest on the construction loan; $22,467.84, to its title company; and $17,000 to Trade Bank, leaving Trade Bank with $82,000 of its original loan unpaid.

Ultimately, work stopped on the project; Long Island foreclosed on its construction loan; the property was sold at foreclosure to Long Island for $200,000; and the present controversy relates to net sales proceeds amounting to $179,819.45 in the hands of the trustees under the deed of trust which secured Long Island's loan.

The Cornells excepted to the auditor's account which awarded the net proceeds of the foreclosure sale in the hands of the trustees to Long Island in partial satisfaction of its claim. From an order overruling their exceptions, the Cornells have appealed.

The basic thrust of the Cornells' argument is that their note for $55,000 with interest from 29 January 1967 should be a prior charge on the foreclosure proceeds because (i) Long Island failed to disclose the Trade Bank loan of $200,000 and Zipkin's assignment of the first draws of construction money to secure it, and (ii) Long Island voluntarily advanced funds under the construction loan agreement after it had notice of the intervening lien of the Cornell deed of trust.

### (i)

Pierce J. Power, an attorney for Long Island, was called as a witness by the Cornells. He testified that under New York law as it stood at the time of the Zipkin loan a savings bank was restricted in the making of loans on unimproved real estate. As a consequence Power said it was not unusual for a construction loan borrower to negotiate a loan with a commercial bank for "front" or "seed" money, *i.e.*, funds to be used to pay prior mortgages, the fees of architects, surveyors, engineers and attorneys and recording costs. Such a borrowing, according to Power's testimony, was usually secured by an assignment of funds to be drawn down under the construction loan agreement.

Mr. Power explained why he did not tell the Cornells' counsel about the Trade Bank loan:

"Well, * * * I didn't think it was that important because it was a relatively small amount of money in comparison to the amount of the loan the bank was going to make.

"The [construction] loan agreement allowed for assignment. I was convinced in my own mind that the money Trade Bank was giving to 4718 [Bethesda Ave., Inc.] was to be used for the cost of the improvement itself and this is usual in New York. I mean, Mr. Macdonald [the Cornells' counsel] asked me some very specific questions in his letter and I answered the questions and I just did not answer that one because he didn't ask it. I don't know how far I am supposed to go when someone sends me a letter. Am I supposed to reiterate what all the fees are that are coming out of the proceeds of the Trade Bank loan? I don't know. And I just stopped at what he asked me and I volunteered to answer any question he had and I didn't hear anything further from him."

Certainly it is true that Zipkin, although in his capacity as president of The Wheeler Corporation, prior to the April 24 closing with Long Island, had certified to Trade Bank that the entire proceeds of its loan would be used in support of the 4718 Bethesda Avenue project.

While we agree that the Cornells were badly used, two aspects of the problem are quite clear. First, since the Cornells had agreed to subordinate their deed of trust to "a bona-fide construction loan made by a reputable lending institution," they undertook an unconditional commitment to subordinate to any construction loan, and even had they known of the arrangement with Trade Bank, which, after all, was a matter of concern only to Long Island, would have been in no position to refuse to subordinate.

Under the testimony, it can scarcely be argued that the arrangement with Trade Bank put the bona fides of the Long Island loan in question. It is true, as the Cornells contend, that the loan agreement, of which they had a copy, contained covenants that the borrower would hold advances in trust to be applied to the costs of improvement and would not assign moneys due under the agreement without Long Island's consent. But it is equally true that the Cornells knew that Long Island would permit an assignment, because the Cornells had exacted such an assignment as consideration for their subordination on the theory that they had agreed to subordinate to a construction loan, but not to permanent financing.

Secondly, there is nothing in the record to indicate that Zipkin would not have been in deep trouble had the Trade Bank loan never been made.

In reaching this conclusion, we have not overlooked the other arguments advanced by the appellants and the appellees, but have chosen to ground our opinion on the points which we regard as controlling.

### (ii)

The Cornells, relying on *Lamar v. Nylen,* 240 Md. 740, 215 A. 2d 806 (1966); *Blaustein v. Aiello,* 231 Md. 375, 190 A. 2d 639 (1963); and *Frank M. Ewing Co. v. Krafft Co.,* 222 Md. 21, 158 A. 2d 654 (1960), to which we would add *Riggs National Bank v. Welsh,* 254 Md. 207, 254 A. 2d 172, 255 A. 2d 289 (1969), argue that when Long Island continued to disburse construction loan funds after it was on notice of the claims of intervening creditors, Long Island's advances were voluntary and lost their character as senior debt.

It seems to be conceded that the advances made by Long Island from 16 May 1967 to 8 December 1967 were made in strict conformity with the provisions of the loan agreement. These advances, which aggregated $719,936, were not voluntary—they were advances which Long Island was obligated to make. But whether we regard as voluntary, payments of $50,000 made on 19 January 1968, as

the lower court did, or payments of $194,000 made after 13 October 1967, when Long Island first received notice of a subcontractor's intention to assert a mechanics' lien, does not alter the result reached below. In either event a portion of Long Island's claim lost its senior position. Whether the amount be $50,000 or $194,000, Long Island still retained its position as a secured creditor for an amount not less than $575,936, which was well in excess of sale proceeds of $179,819.45.

*Order affirmed, costs to be paid by appellants.*